**DAR EL–BINA ENGINEERING & CONTRACTING COMPANY, LTD. and Mishary Al–Kahlid & Partners International Company, W.L.L., Plaintiffs,**

v.

**THE REPUBLIC OF IRAQ, the Ministry of Local Government—the General Establishment for Implementing Water and Sewerage Projects of the Public of Iraq, the Ministry of Housing & Construction of the Republic of Iraq, and Al–Rafidain Bank, Defendants.**

**No. 96 Civ. 5808 (LAK).**

United States District Court, S.D. New York.

Jan. 7, 2000.

---

David A. Hill, Jr., Levin, Ford & Paulekas, L.L.P., for Plaintiffs.

Edward L. Powers, Joan Walter, Richards & O'Neil, L.L.P., New York City, for Defendant Rafidain Bank.

## OPINION

KAPLAN, District Judge.

This action is brought by two Kuwaiti companies for nonpayment of promissory notes guaranteed by an Iraqi bank. The threshold issue facing the Court is whether

the Foreign Sovereign Immunities Act provides jurisdiction to adjudicate this action in a United States court, or whether the Iraqi bank is immune from suit by virtue of its status as an instrumentality of a foreign state.

### Facts

Plaintiffs Dar El–Bina Engineering & Contracting Company ("Dar El–Bina") and Mishary Al–Kahlid & Partners ("Mishary") are both Kuwaiti companies with principal places of business in Kuwait. They are partners in two joint ventures that were involved in bidding on and completing construction projects for the Republic of Iraq. Iraq defaulted on the contracts, which were awarded by Iraq's Ministry of Housing and Construction of the Republic of Iraq ("Ministry of Housing") and Ministry of Local Government— The General Establishment for Implementing Water and Sewerage Projects ("Ministry of Local Government"), and later issued promissory notes in lieu of payments due to plaintiffs. Iraq subsequently defaulted on the promissory notes, which were guaranteed by defendant Rafidain Bank ("Rafidain"). Plaintiffs filed suit following this last default and Rafidain's corresponding failure to satisfy its obligations as guarantor of the notes, charging breach of contract, negligence, conversion, unjust enrichment, and default on the promissory notes. The complaint names both Ministries and the Republic of Iraq as well as Rafidain but, because Rafidain is the only defendant to appear before the Court, this opinion addresses only the rights and obligations of Rafidain.

*The Tikrit and Hilla Construction Projects*

In November 1980 the Ministry of Housing accepted a bid from plaintiffs, as members of a joint venture (the "Tikrit Consortium"), to construct a medical rehabilitation center in Tikrit, Iraq.[1] The parties entered into a construction contract in January 1981, pursuant to which plaintiffs were to receive 19,739,831.730 Iraqi dinars ("I.D.")[2] in exchange for constructing the rehabilitation facility and operating it for 18 months.[3] A portion of the money due under the contract was to be paid in a lump sum in advance of performance, with the remainder to be paid in monthly progress payments and a final payment upon completion of the project. Payment was to be made in several different currencies, as follows: (1) 25 percent in Iraqi dinars, (2) 30 percent in U.S. dollars, (3) 15 percent in Japanese yen, and (4) 30 percent in Swiss francs, with all non-Iraqi currencies to be to be transferred outside Iraq at the then-prevailing exchange rates.[4]

Around the same time, plaintiffs entered into another joint venture (the "Hilla Consortium") for purposes of bidding on a contract to build a sewerage network in Hilla, Iraq.[5] The bid was accepted by the Ministry of Local Government in February 1981 and, in March 1981, the parties entered into a construction contract.[6] Under the contract, the Hilla Consortium was to receive I.D. 10,629,381.423 in exchange for constructing the sewerage network and maintaining it for 12 months.[7] Like the Tikrit contract, the Hilla contract was payable in an advance lump sum, monthly progress payments, and a final payment due upon completion with a significant portion of the price payable in foreign hard currency. In this case, 70 percent of the contract price was to be paid in U.S. dollars.[8]

*The Tikrit and Hilla Finance Agreements*

Prior to execution of the Tikrit and Hilla contracts, war commenced between Iraq

---

1. First Amended Cpt. ¶ 27.

2. *Id.* ¶¶ 28, 32.

3. *Id.* ¶¶ 35, 37.

4. *Id.* ¶ 33.

5. *Id.* ¶ 74.

6. *Id.* ¶¶ 79, 80.

7. *Id.* ¶¶ 82, 85, 86.

8. *Id.* ¶¶ 82, 83.

and Iran.[9] The war caused unforeseen delays of both construction projects[10] and disruptions to Iraq's economy that resulted in Iraq's failure to make progress payments due under both the Tikrit and Hilla contracts.[11] Because Iraq did not honor its payment obligations and defaulted on the construction contracts, the Tikrit and Hilla Consortia entered into finance agreements in lieu of the remaining hard currency payments owed to them.

The Hilla finance agreement, executed in December 1983, called for six promissory notes to be issued to the Hilla Consortium for principal amounts of $458,451.29, $515,202.68, $252,659.41, $137,853.15, $386,374.45, and $151,244.51.[12] The notes specified that payment would be made to the National Bank of Kuwait in Kuwait and that interest was payable every six months.[13] The six notes, which were issued between February 1985 and April 1986, each were guaranteed by Rafidain.[14]

The Tikrit finance agreement was executed in January 1987[15] and called for the issuance of four promissory notes. The notes, which required interest to be paid every six months, were issued in the amounts of $400,000, 614,799 Swiss francs, 30,639,999 Japanese yen, and 30,639,999 Japanese yen,[16] and were made payable in "Kuwait or any other place the beneficiary chooses."[17] Like the Hilla notes, the Tikrit notes were guaranteed by Rafidain.[18]

As the Tikrit and Hilla notes came due, the parties agreed to extend their maturities contingent upon the continued payment of interest.[19] Interest payments were timely made until Iraq's invasion of Kuwait in August 1990,[20] when defendants ceased making payments to plaintiffs. Since then, neither interest payments nor the principal amounts due and payable on the notes have been paid. Rafidian, as guarantor of the notes, became liable for the amounts due under them no later than the Ministries' respective defaults, but Rafidain also has failed to make payments to plaintiffs since Iraq's invasion of Kuwait. Plaintiffs here sue Rafidain on the guarantees.[21]

### Discussion

*Prior Proceedings*

None of the defendants answered the original complaint or otherwise appeared. The Court granted plaintiffs' motion for default judgment on January 6, 1998 and referred the matter to a magistrate judge for an inquest.

Prior to final determination of damages and the entry of judgment, defendant Rafidain moved to vacate the default judgment and dismiss the action against it for lack of subject matter and *in personam* jurisdiction. Plaintiffs and Rafidain then stipulated to the filing of an amended complaint and an amended motion to dismiss, both of which were duly filed. Plaintiffs consented to a vacatur of the order granting the motion for default judgment against Rafidain, and the Court now considers Rafidain's motions to dismiss this action as to Rafidain on the grounds that the Court lacks subject matter and personal jurisdic-

---

9. *Id.* ¶¶ 27, 78.

10. *Id.* ¶¶ 43, 44, 92, 93. Both projects were completed, in spite of the delays, although later than expected. *Id.* ¶¶ 49, 98.

11. *Id.* ¶¶ 46, 47, 95, 96.

12. *Id.* ¶¶ 108, 113.

13. Cpt., Ex. J.

14. First Amended Cpt. ¶ 114.

15. *Id.* ¶ 56.

16. *Id.* ¶¶ 60, 61.

17. Cpt., Ex. I.

18. First Amended Cpt. ¶ 62.

19. *Id.* ¶¶ 131, 149, 168, 187, 454, 472, 490, 508, 526, 544.

20. *Id.* ¶¶ 70, 117.

21. Pl. Mem. of Law in Opposition to Motion to Dismiss ("Pl.Mem.") 9–10.

tion and that the amended complaint fails to state a claim upon which relief may be granted against Rafidain.

*Subject Matter Jurisdiction*

■■■ Traditionally, foreign states have enjoyed broad sovereign immunity from suit in United States courts. In recent times, however, increased contacts between American citizens and foreign states and their instrumentalities have resulted in a greater need for access to judicial fora to resolve disputes arising from such interactions.[22] In 1976, Congress passed the Foreign Sovereign Immunities Act ("FSIA")[23] in response to this need. Designed to insure that the principle of sovereign immunity is applied uniformly and with minimal adverse consequences to U.S. foreign policy,[24] the FSIA does primarily two things: (1) it provides comprehensive standards governing access to the federal and state courts for plaintiffs asserting claims against foreign states and their instrumentalities,[25] and (2) it grants federal district courts original jurisdiction over any civil claims against a foreign state for which there is no immunity under the Act[26] and gives foreign states the right to remove any such action brought in a state court to federal district court.[27] The FSIA now is the sole basis for obtaining subject matter jurisdiction over a foreign state, its agencies, or its instrumentalities.[28] Under the FSIA a foreign state is immune from jurisdiction in the United States absent an express waiver of immunity or an applicable statutory exception.[29] Where there is no immunity, the federal district courts have subject matter jurisdiction and, if service of process is made in accordance with the FSIA, there is personal jurisdiction over the foreign defendant.[30]

■■■ In this case, plaintiffs both are Kuwaiti companies, Iraq is a foreign state, and the Ministries and Rafidain each are agencies or instrumentalities of Iraq. Thus, the FSIA clearly applies to this action. Since Rafidain has not waived its immunity, plaintiffs' access to this Court depends on whether one of the statutory exceptions applies.[31] Probably the most significant of these exceptions, and the only one that plaintiffs seek to invoke, covers cases involving commercial activities of a foreign state that either take place or have a direct effect in the United States.[32] If plaintiffs can prove that this exception applies and that Rafidain was served properly, this Court has subject matter as well as personal jurisdiction over Rafidain.[33]

*Exceptions to Immunity Under § 1605(a)(2)*

■■■ The language of Section 1605(a)(2) is precise and should be construed narrowly.[34] It provides:

22. *See* 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3662 (1998) (hereinafter Wright).

23. 28 U.S.C. § 1602, *et seq.*

24. Prior to the enactment of the FSIA, a foreign state seeking immunity from suit would request such immunity from the Department of State. Under the FSIA, this determination is made by the judicial rather than the executive branch. *See Martin v. Republic of South Africa*, 836 F.2d 91, 93 (2d Cir.1987) (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6606); 14A Wright § 3662.

25. 14A Wright § 3662.

26. 28 U.S.C. § 1330(a).

27. *Id.* § 1441(d).

28. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); 14A Wright § 3662.

29. 28 U.S.C. § 1604.

30. *Id.* § 1330(b).

31. *Id.* § 1605.

32. *Id.* § 1605(a)(2).

33. *See id.* § 1330.

34. 14A Wright § 3662.

"A foreign state or its instrumentalities shall not be immune from the jurisdiction of courts of the United States or of the States in any case ---

\* \* \* \* \* \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States...." [35]

Plaintiffs rely on the third clause of this subsection in arguing that Rafidain is not immune from suit under the FSIA.[36] As an initial matter, none of the parties disputes that Rafidain's role as guarantor of the promissory notes constitutes "commercial activity" for purposes of the FSIA.[37] The more difficult question is whether or not Rafidain's commercial activity had a direct effect in the United States and thus triggered the third clause of Section 1605(a)(2).

In order to make this determination, it is necessary to distinguish clearly among the different promissory notes and their conditions of payment. Each of the four Tikrit notes specifies that its place of payment is "Kuwait or any other place the beneficiary chooses," [38] but only one is payable in U.S. dollars ("Tikrit Note 1"). Moreover, prior to the Iraqi invasion of Kuwait, interest was paid on Tikrit Note 1 by transfer of funds from Rafidain's accounts at Irving Trust and Morgan Guaranty in New York to plaintiffs' accounts at the same institutions.[39]

All six of the notes issued pursuant to the Hilla finance agreement are payable in U.S. dollars, and interest on all six was paid by transfer from Rafidain's New York accounts at Irving Trust and Morgan Guaranty to plaintiffs' accounts at Irving Trust and Morgan Guaranty until August 1990.[40] Unlike the Tikrit notes, however, the Hilla notes state that they are payable to the National Bank of Kuwait in Kuwait.[41]

Each of the ten notes was guaranteed by defendant Rafidain, which served also as the financial institution that facilitated the Ministry of Housing and the Ministry of Government's New York payments on the Hilla notes and Tikrit Note 1.

Plaintiffs assert that they designated New York as the place of payment for Tikrit Note 1, that defendants acquiesced in this designation by making interest payments via transfer of funds from defendants' accounts located in New York to plaintiffs' accounts located in New York, and that the failure to continue making such payments in the United States has a direct effect here.[42] They rely on *Republic of Argentina v. Weltover.*[43]

---

**35.** 28 U.S.C. § 1605(a)(2).

**36.** Pl. Mem. 11–15. Although plaintiffs initially asserted that this Court has jurisdiction under any of the three clauses of Section 1605(a)(2), they have since failed to prosecute under the first two clauses of that subsection. In their memoranda of law and at oral argument, they relied solely on the "direct effect" exception of Section 1605(a)(2). The Court therefore considers only the third clause of Section 1605(a)(2).

**37.** The Second Circuit has defined commercial activity as that in which a state, or an entity of the state, "acts not in its governmental or public role, but rather like a private player in the marketplace." *Bank v. Pt. Bank Negara Indonesia (Persero),* 148 F.3d 127, 131 (2d Cir.1998).

**38.** Cpt., Ex. I.

**39.** First Amended Cpt. ¶ 128.

**40.** *Id.* ¶¶ 451, 469, 487, 505, 523, 541.

**41.** Cpt., Ex. J.

**42.** Pl. Mem. 14–15.

**43.** 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

*Weltover* involved a dispute over the rescheduling of Argentinian bonds that were payable through transfer on the London, Frankfurt, Zurich, or New York markets, at the election of the creditor.[44] Plaintiffs, two Panamanian corporations and a Swiss bank, declined to accept Argentina's rescheduling of the bonds and insisted on repayment in New York.[45] Because New York had been designated as the place of payment, pursuant to the terms of the bonds, and Argentina had made some interest payments here prior to its default, the Court held that the rescheduling of Argentina's contractual obligations, i.e., the payment default, had a direct effect in the United States.[46]

The Second Circuit has applied *Weltover* in several relevant cases. In *International Housing Ltd. v. Rafidain Bank Iraq*,[47] a corporation organized in the Cayman Islands attempted to enforce a default judgment that had been entered against Rafidain in the Bahamas.[48] Like the plaintiffs in this action, International Housing Limited ("IHL") had contracted with a division of the Iraqi government to construct housing. As a result of the Iran–Iraq war, Iraq defaulted on the contract and eventually repudiated it entirely.[49] In *International Housing*, Rafidain had issued overdraft credit for IHL's use during construction and later requested that the guarantor of the overdraft credit honor its guarantees by depositing funds into Rafidain's accounts in New York, which the guarantor did, debiting IHL's accounts correspondingly.[50] IHL sued and obtained a default judgment against Rafidain in the Bahamas and filed suit to enforce that judgment in New York, where it obtained another default judgment against Rafidain.[51] The Second Circuit ultimately held that there was no subject matter jurisdiction on the ground that payments that were made to a New York account at Rafidain's direction, but were not contractually required to be made in New York, did not have a sufficient effect in the United States to support jurisdiction under Section 1605(a)(2).[52] The court held that the New York bank's role was that of a "passive conduit indifferent to the nature or terms of the underlying transaction" and that the effect of the payments was felt at the situs of the payee, in that case Iraq.[53]

In so holding, the court distinguished its decision in *International Housing* from its previous holding in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,[54] on the grounds that the earlier case had involved the breach of a contract that specifically provided for payment in New York, thereby creating a direct effect in New York.[55] Similarly, in *Commercial Bank of Kuwait v. Rafidain Bank*,[56] the Second Circuit held that the failure of certain Iraqi banks to remit funds in New York, as they were bound contractually to do, had a direct effect in the United States under *Weltover*.[57]

Most recently, in *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*,[58] the Second Circuit applied *Weltover* to conclude that nonpayment of an instrument

44. *Id.* at 609–10, 112 S.Ct. 2160.

45. *Id.* at 610, 112 S.Ct. 2160.

46. *Id.* at 619, 112 S.Ct. 2160.

47. 893 F.2d 8 (2d Cir.1989).

48. *Id.* at 9.

49. *Id.* at 10.

50. *Id.*

51. *Id.*

52. *Id.* at 12.

53. *Id.*

54. 647 F.2d 300 (2d Cir.1981).

55. *International Housing*, 893 F.2d at 12.

56. 15 F.3d 238 (1994).

57. *Id.* at 241.

58. 148 F.3d 127 (2d Cir.1998).

that authorizes the holder to designate a place of payment has a direct effect in the designated location.[59] In that case, Hanil Bank held a letter of credit issued by PT. Bank Negara Indonesia (Persero) ("BNI") that provided that the negotiating bank would be reimbursed "according to their instruction." [60] Hanil Bank instructed BNI to remit payment to its Citibank account in New York, BNI refused, and Hanil Bank brought a breach of contract action in New York.[61] The district court rejected a sovereign immunity defense and the circuit affirmed on the ground that Hanil Bank, pursuant to the letter of credit, had designated payment to its account in New York and, as a result of the breach, " '[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming.' " [62] The court held BNI's argument that it had not expressly agreed to make payment in New York, as Argentina in *Weltover* and the Iraqi banks in *Rafidain Bank* had done, to be a "distinction[ ] without a difference." [63] It made clear that the language in the letter of credit expressly authorizing Hanil Bank to designate the manner of reimbursement reflected BNI's implicit agreement to make payment wherever Hanil Bank designated.[64]

■ The synthesis of *Weltover* and its Second Circuit progeny therefore appears to be that nonpayment of a commercial obligation by a foreign state or its instrumentality has a direct effect in the United States if the defaulting party was contractually obligated to pay here. The requisite obligation may arise from explicit language in the instrument or from authorization in

the instrument to designate a place of payment, in which case the maker will be held impliedly to have consented to payment wherever the holder designates.

■ Application of this principle here is straightforward. The six Hilla notes explicitly state that they are payable to the National Bank of Kuwait in Kuwait, and do not grant plaintiffs the authority to designate another legally enforceable place of payment. Even if, as plaintiffs assert in their complaint, interest on the Hilla notes previously was paid by transferring U.S. dollars from Rafidain's accounts at Irving Trust and Morgan Guaranty in New York to accounts designated by the Hilla Consortium in New York,[65] this was done at the Ministry of Local Government's discretion and not because it was under any legal obligation to do so. As the D.C. Circuit Court pointed out in *Goodman Holdings v. Rafidain Bank*,[66] even when payments are made in New York, if New York is not the designated place of performance where money is "supposed" to be paid, payment may "just as well" be made elsewhere.[67] In other words, defendants could have discharged their obligations by tendering payment elsewhere. Similarly, defendants were not obliged to make payments due on the three Tikrit notes payable in Swiss francs and Japanese yen in New York. Although the notes state that they are payable "at any ... place the beneficiary chooses," plaintiffs did not designate New York as their place of payment.[68] In consequence, Rafidain had no obligation to pay three of the four Tikrit or any of the Hilla notes in New York, so its default on those instruments did not have a direct effect in the United States.

59. *Id.* at 132.

60. *Id.* at 129–30.

61. *Id.* at 130.

62. *Id.* at 132 (quoting *Weltover*, 504 U.S. at 619, 112 S.Ct. 2160).

63. *Id.*

64. *Id.*

65. First Amended Cpt. ¶¶ 451, 469, 487, 505, 523, 541.

66. 26 F.3d 1143 (D.C.Cir.1994).

67. *Id.* at 1146–47.

68. First Amended Cpt. ¶¶ 146, 165, 184. Interest on these notes was paid from accounts located in Switzerland and Japan. *Id.*

As the foregoing suggests, Tikrit Note 1 stands differently. Under *Hanil Bank*, the language in Tikrit Note 1 granting plaintiffs the right to choose the place of payment gave rise to a legally enforceable obligation to pay in New York if plaintiffs actually designated New York as the place of payment. Plaintiffs allege that they made this designation and that the Ministry of Housing and Rafidain undertook to make such payments in accordance with their instructions.[69] Rafidain denies that there was an agreement between any of the defendants and the plaintiffs to make payment in New York,[70] implicitly suggesting that there was no such designation. The question facing this Court, then, is whether plaintiffs in fact chose New York as the place of payment in accordance with the terms of Tikrit Note 1. If they did, then *Hanil Bank* requires the conclusion that the failure to make payments of interest and principal on Tikrit Note 1 had a direct effect in the United States, and this Court has jurisdiction under the FSIA.[71]

*Did Plaintiffs Designate New York as the Place of Payment for Tikrit Note I?*

*Choice of Law*

■ As the existence of a direct effect caused by the nonpayment on Tikrit Note

1 depends upon whether Rafidain had a contractual obligation to pay in the United States, the first task is to determine the law that governs that question. The Supreme Court has held, as a general matter, that state substantive law is controlling in FSIA cases.[72] This accords with Congress' intent to make a foreign state "liable [under the FSIA] in the same manner and to the same extent as a private individual under like circumstances."[73] In consequence, the FSIA requires courts to utilize the choice of law analysis of the forum state with respect to all issues governed by state substantive law.[74]

■ Here, however, there is no need to engage in detailed choice of law analysis.[75] Where, as here, parties fail to provide information as to the content of applicable foreign law, the law of the forum determines how the issue should be resolved.[76] Under New York law, the parties' failure to plead and prove applicable foreign law permits the court to proceed on the assumption that the law of the foreign jurisdiction accords with that of New York on the subject.[77] The Court therefore applies New York contract law in determining whether plaintiffs designat-

---

**69.** Pl. Mem. 9.

**70.** Rafidain's Reply Mem. in Support of its Motion to Dismiss 1, 3–4.

**71.** *See Hanil Bank*, 148 F.3d at 132.

**72.** *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).

**73.** 28 U.S.C. § 1606 (1994 & West Supp. 1999).

**74.** *Barkanic v. General Administration of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 959 (2d Cir.1991), *citing First National City Bank*, 462 U.S. at 622 n. 11, 103 S.Ct. 2591. *See also Alonso v. Saudi Arabian Airlines Corp.*, No. 98 Civ. 7781(SAS), 1999 WL 244102, *4 (S.D.N.Y. Apr. 23, 1999).

**75.** Although the issue need not be decided, it seems relatively plain that New York would apply the law of Iraq in determining the

scope of Rafidain's obligations on the guarantee. New York in contract cases applies the law of the jurisdiction with the most significant interest in the dispute. *E.g., Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir.1996). As Tikrit Note 1 and the guaranty were issued by Iraqi parties in connection with an Iraqi construction project, it seems likely that Iraq's interest in supplying the rule of decision far exceeds that of New York, and perhaps even that of Kuwait, the domicile of the plaintiffs.

**76.** *See Gold–Flex Elastic Ltd. v. Exquisite Form Indust., Inc.,* No. 95 Civ. 3881(LMM), 1995 WL 764191, at *3–4 (S.D.N.Y. Dec. 28, 1995); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 136 cmt. g (1969).

**77.** *See Stein v. Siegel,* 50 A.D.2d 916, 917, 377 N.Y.S.2d 580, 583 (2d Dept.1975) (citing *Read v. Lehigh Valley R.R. Co.,* 284 N.Y. 435, 31 N.E.2d 891 (1940)). *See also* FED. R. CIV. P. 44.1; *Bartsch v. Metro–Goldwyn–Mayer, Inc.,*

ed New York as the place of payment for Tikrit Note 1.

## No Express Designation

■ As the guarantor of Tikrit Note 1, Rafidain is obligated to make payment in the same manner and at the same place as the Ministry of Housing.[78] Therefore, if plaintiffs designated New York as the place where the Ministry of Housing was obliged to make payments on Tikrit Note 1, then Rafidain also had a legal obligation to make payments in New York. Although plaintiffs point to an affidavit of the managing partner of Dar El–Bina in support of their assertion that they did so, the relevant paragraphs clearly describe the agreements that plaintiffs reached with the Iraqi Ministries for payment on the original contracts.[79] The affidavit simply does not address the place of payment of Tikrit Note 1 or, for that matter, any other note issued pursuant to the finance agreements.

## Practical Construction

Because there is no proof that plaintiffs informed the Ministry of Housing of their designation of New York as the place of payment for Tikrit Note 1, the Court must look to other indicia of whether such a designation truly was made. Plaintiffs argue that the Ministry of Housing's course of conduct between 1987 and 1990, specifically the making of interest payments due under Tikrit Note 1 by transferring funds from defendant's New York accounts to plaintiffs' New York accounts,[80] demonstrates that there was an agreement between the parties that payment would be made in New York.[81]

■ The conduct of the parties is certainly a good indication of their understanding of their obligations with respect to the note.[82] There is a long line of New York case law endorsing the doctrine of

391 F.2d 150, 155 n. 3 (2d Cir.1968) (federal court would not independently investigate German law where parties did not suggest that it differed from New York law); *El Hoss Engineering & Transport Co. v. American Independent Oil Co.*, 183 F.Supp. 394, 399 (S.D.N.Y.1960) (failure to raise question of Kuwaiti law effectively waived rights of either party under Kuwaiti law), *rev'd on other grounds*, 289 F.2d 346 (2d Cir.), *cert. denied*, 368 U.S. 837, 82 S.Ct. 51, 7 L.Ed.2d 38 (1961).

**78.** *See Bank of New York v. Bersani*, 90 A.D.2d 302, 306–07, 457 N.Y.S.2d 142, 144–45 (4th Dept.1982) (guarantor of payment assumes liability "indistinguishable from that of a co-maker") (quoting Official Comment to U.C.C. § 3–416); N.Y. Unif. Comm.Code § 3–416 & Official Comment (McKinney 1999). Rafidain guaranteed payment, making itself liable upon the Ministry of Housing's default for payments due under the notes in the same manner as the Ministry would be. *See Ameritrust Co. Nat'l Assoc. v. Chanslor*, 803 F.Supp. 893, 896 (S.D.N.Y.1992) (under New York law, guaranty and notes executed contemporaneously will be read and interpreted together).

**79.** Matar Aff. ¶¶ 9, 30.

**80.** Plaintiffs assert that the Ministry of Housing made interest payments due under Tikrit Note 1 by having Rafidain transfer funds on

its behalf from accounts at Irving Trust and Morgan Guaranty, in New York, to The National Bank of Kuwait's accounts at Irving Trust and Morgan Guaranty, as well as its own New York branch, from February 28, 1987 until December 1990. Matar Aff. ¶¶ 18, 19. In their papers, plaintiffs alternate between stating that the defendants' default took place in August 1990, when Iraq invaded Kuwait, and December 1990, when the interest payment on Tikrit Note 1 was actually due. Because the payment was not due until December 31, 1990, any default necessarily took place after that date.

**81.** Pl. Mem. 15–17.

**82.** *See, e.g., City of New York v. New York City Ry. Co.*, 193 N.Y. 543, 548, 86 N.E. 565 (1908); *Woolsey v. Funke*, 121 N.Y. 87, 92, 24 N.E. 191 (1890); *Syms v. Mayor, Etc. of New York*, 105 N.Y. 153, 157, 11 N.E. 369 (1887); *Division of Triple T Service, Inc. v. Mobil Oil Corp.*, 60 M.2d 720, 732, 304 N.Y.S.2d 191, 203 (Sup.Ct.West.Co.1969). See also *Breeden v. Bennett (In re The Bennett Funding Grp., Inc.)*, 220 B.R. 743, 760–61 (Bankr.N.D.N.Y. 1997) (" 'Unquestionably, the practical construction or uniform conduct or practice of the parties under a contract is a consideration of much importance in ascertaining its meaning and that consideration is entitled to great, if not controlling, influence in ascertaining the parties' understanding of the contract

practical construction and allowing courts to look to the parties' practical interpretations of a contract, as demonstrated by their conduct, in determining their intentions with regard to ambiguous contractual language.[83] Where, as here, the language of the note is clear but designation of a material term is uncertain, the rationale underlying the doctrine of practical construction informs the Court's determination of whether plaintiffs designated New York as the place of payment for Tikrit Note 1.

Given the terms of Tikrit Note 1, and the clear authorization granted to plaintiffs to designate the place of payment of their choice, it is not necessary for the Court to find a meeting of the minds or a mutual agreement between the parties. If plaintiffs designated New York as the place of payment, Rafidain had a legally enforceable obligation in New York. Whether the designation was made is a question of fact.

■■■■■ The Second Circuit has held that where "'[subject matter] jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment'" to a Rule 12(b)(1) motion.[84] Thus, if plaintiffs have pleaded and proven subject matter jurisdiction, Rafi-

dain's challenge to jurisdiction purely on the pleadings must be denied if it has failed to demonstrate that there is no genuine dispute as to any material fact.[85] Construing the pleadings in the manner most favorable to plaintiffs,[86] the parties' conduct permits an inference that New York was the designated place of payment for Tikrit Note 1,[87] a question of fact that prevents the Court from granting summary judgment against plaintiffs.[88] Defendant's motion to dismiss the claim based on Tikrit Note 1 therefore must be denied although plaintiffs will bear the burden of proving jurisdiction should the case proceed to trial.

*Supplemental Jurisdiction Over the Claims on the Three Remaining Tikrit Notes*

Plaintiffs argue that the Court should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Tikrit promissory notes payable in Swiss francs and Japanese yen because they arise out of the same construction contract and finance agreement as Tikrit Note 1.[89] As the Court concludes below that the claim based on Tikrit Note 1 is barred by the statute of limitations, however, it would decline to exercise supplemental jurisdiction even if supplemental jurisdiction oth-

terms and language."'" (quoting *Clay v. Perry (Matter of Perry, Adams and Lewis Securities, Inc.)*, 30 B.R. 845, 850–51 n. 15 (Bankr. W.D.Mo.1983) (quoting 17 AM.JUR.2D, CONTRACTS § 274, at 683–84 (1964)))).

**83.** *See, e.g., Nicoll v. Sands*, 131 N.Y. 19, 23–24, 29 N.E. 818 (1892); *Village Savings Bank v. Caplan*, 87 A.D.2d 145, 150, 451 N.Y.S.2d 159, 162 (2d Dept.1982); *Hart v. John G. Hellman Co.*, 17 A.D.2d 438, 444, 235 N.Y.S.2d 23, 30 (1st Dept.1962), *aff'd* 13 N.Y.2d 633, 240 N.Y.S.2d 612, 191 N.E.2d 96 (1963).

**84.** *London v. Polishook*, 189 F.3d 196, 198 (2d Cir.1999) (quoting *Careau Group v. United Farm Workers of Am., AFL–CIO*, 940 F.2d 1291, 1293 (9th Cir.1991)).

**85.** *See, e.g., Liebowitz v. Elsevier Science Ltd.*, 927 F.Supp. 688, 698 (S.D.N.Y.1996).

**86.** *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir.1995).

**87.** *Cf. Jamaica Savings Bank v. Lefkowitz*, 390 F.Supp. 1357, 1361 (E.D.N.Y.) (some circumstances make it possible to infer certain unstated contract terms), *aff'd* 423 U.S. 802, 96 S.Ct. 10, 46 L.Ed.2d 23 (1975); *Trolf v. Trolf*, 143 M.2d 26, 28, 539 N.Y.S.2d 637, 638 (Dist. Ct. Nassau Co.1989).

**88.** *See, e.g., 407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281, 283, 296 N.Y.S.2d 338, 343, 345, 244 N.E.2d 37 (1968) (denying motion for summary judgment because ambiguity in agreement presented an issue of fact).

**89.** Pl. Mem. 19–20.

erwise would apply here.[90] And it would reach the same result even if the claim on Tikrit Note 1 survived this motion.

■ Although Article III of the Constitution grants judicial power to hear claims that are so closely related to those over which a court has subject matter jurisdiction as to form part of the same case or controversy,[91] the exercise of this power must be authorized by Congress.[92] If the claim on Tikrit Note 1 were timely, the Court therefore would be obliged to determine whether Congress has authorized the exercise of jurisdiction over claims that do not satisfy any of the exceptions to immunity contained in the FSIA, but that form part of the same case or controversy as a claim over which FSIA jurisdiction exists. In order to do so, it would be necessary to consider both the text and the context of the FSIA.

The language of the FSIA provides considerable guidance on this question. Section 4(a) of the FSIA provides that foreign states "shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of" title 28.[93] It provides also that a foreign state "shall be liable in the same manner and to the same extent as a private individual in like circumstances" "[a]s to *any claim* for relief with respect to which a foreign state is not entitled to immunity ...,"[94] thus limiting the extent of the liability of the foreign state to liability on claims—as opposed to cases—as to which immunity is lacking. This is reinforced by Section 2 of the FSIA, which confers original jurisdiction on the district courts "of any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity...."[95] Indeed, the House Report on the statute makes the same point, stating that the Act was "intended to preempt any other State or Federal law ... for according immunity to foreign sovereigns" and describes the extent of the jurisdiction conferred on the district courts as reaching "any *claim* with respect to which the foreign state is not entitled to immunity...."[96] Hence, the text of the statute strongly suggests that Congress meant to confer jurisdiction on the district courts only with respect to specific claims as to which immunity was lacking.[97]

---

**90.** 28 U.S.C. § 1367(c)(3) (court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction ...").

**91.** U.S. Const., art. III, § 2.

**92.** Article III delineates the outer limits of federal subject matter jurisdiction. Within those limits, federal courts may decide only those cases that Congress authorizes them to hear. *Finley v. United States*, 490 U.S. 545, 547–48, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989).

**93.** 28 U.S.C. § 1604.

**94.** *Id.* § 1606 (emphasis added).

**95.** *Id.* § 1330(a).

**96.** H.R. Rep. No. 94–1487, §§ 1, 2(a) (1976) (emphasis added).

**97.** A number of courts have held that the FSIA permits the exercise of what formerly was called pendent party jurisdiction, i.e., to hear in FSIA cases not only claims against foreign states, but closely related claims against other parties over which there is no independent basis of jurisdiction. *E.g., Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1409 (9th Cir.1989); *Colgan v. Port Auth. of N.Y. & N.J.*, No. 91 Civ. 1136, 1991 WL 180384, *3 (E.D.N.Y. Aug. 14, 1991); *contra Schlumberger Indus., Inc. v. Nat'l Surety Corp.*, 36 F.3d 1274, 1279–80 (4th Cir.1994). But these cases involve different considerations. The question whether a court should hear a claim against a non-governmental party that arises out of a common nucleus of operative fact as a claim against a foreign state which, by virtue of the FSIA, is within the exclusive jurisdiction of the federal courts involves only questions of judicial economy and administration. In contrast, the issue here is whether the Court has the power to hear claims against a foreign state as to which the foreign state enjoys sovereign immunity simply because it has original jurisdiction over a related claim as to which there is no immunity. The pendent party cases do not inform that question.

■ The fact that the supplemental jurisdiction statute, Section 1367 of the Judicial Code, was enacted in 1990 and therefore after enactment of the FSIA, does not alter this conclusion. The statute, with exceptions, confers supplemental jurisdiction over all claims not otherwise within the original jurisdiction of the district courts "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." [98] But this aspect of Section 1367 is simply declarative of the rule of *United Mine Workers v. Gibbs*,[99] which long predated enactment of the FSIA.[100] The supplemental jurisdiction concept upon which plaintiffs rely thus was well known to Congress, under the sobriquet "pendent jurisdiction," when it enacted the FSIA with the textual limitations on

district court jurisdiction referred to above. In consequence, this Court holds that the jurisdiction conferred on the district courts by the FSIA may not be expanded by application of Section 1367(a) and the doctrine of supplemental jurisdiction. It therefore lacks jurisdiction over plaintiffs' claims based on the nonpayment of the Tikrit notes payable in foreign currencies.

■ Even if supplemental jurisdiction were applicable in an FSIA case, the analysis would not be at an end, as its exercise is discretionary within certain parameters. Section 1367(c) permits a district court which has power to hear a supplemental claim to decline to do so where, in exceptional circumstances, there are compelling reasons to do so.[101] While the power to decline the exercise of supple-

---

Similarly, the Court is mindful that the removal statute permits a foreign state to remove any civil *action* against it to the federal courts, not merely claims as to which it lacks immunity. 28 U.S.C. § 1441(d); *Nolan v. Boeing Co.*, 919 F.2d 1058, 1064 (5th Cir. 1990). At first blush, this might suggest that the FSIA confers jurisdiction over actions against foreign states, not merely certain claims against them, and thus provides a basis for the exercise of supplemental jurisdiction. Upon closer inspection, however, the suggestion is unpersuasive.

One of the goals of the FSIA was "to render uniform in procedure and substance the treatment of foreign sovereigns subjected to suit in American courts," in part by ensuring a federal forum. *Nolan*, 919 F.2d at 1065. This requires a right to remove all cases against foreign states, irrespective of whether such cases include claims as to which sovereign immunity is lacking. Once such a case reaches a federal court by removal, however, the federal court still must determine whether the case may proceed, which depends upon the existence or lack of sovereign immunity. *See* 28 U.S.C. §§ 1604–07. In consequence, there is no inconsistency in holding that the right of removal extends to all actions against foreign states, but that the power of the federal courts to adjudicate claims against foreign states depends upon a claim-by-claim determination of whether sovereign immunity exists. Put another way, federal removal jurisdiction in these circumstances is not necessarily coextensive with subject matter jurisdiction in the

sense of power to decide the merits of particular claims.

**98.** 28 U.S.C. § 1367(a).

**99.** 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**100.** *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 n. 2 (2d Cir.1993); *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 254 (2d Cir.1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Harry Winston, Inc. v. Kerr*, No. 99 Civ. 0290(LAK), 1999 WL 961786, *1 (S.D.N.Y. Oct. 20, 1999); *Naftchi v. New York Univ.*, 14 F.Supp.2d 473, 492 & n. 153 (S.D.N.Y. July 29, 1998); *Smylis v. City of New York*, 983 F.Supp. 478, 483 (S.D.N.Y. 1997). The Second Circuit's recent decision in *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446–47 (2d Cir. 1998), is not to the contrary. *Itar–Tass* held that Section 1367(c), which specifically enumerates the situations in which a district court may decline to exercise existing supplemental jurisdiction, superseded that portion of *Gibbs* which gave district courts relatively broad discretion to decline to exercise existing supplemental jurisdiction. *Id.* at 446–47. *Itar–Tass* did not suggest, however, that Section 1367(a) altered the *Gibbs* standard for determining whether supplemental jurisdiction exists in the first place. *Naftchi*, 14 F.Supp.2d at 492 n. 153.

**101.** 28 U.S.C. § 1367(c)(4).

mental jurisdiction on this ground rarely will be exercised,[102] the Court regards this as an appropriate circumstance in which to exercise that power.

The United States has little if any interest in providing a forum for the resolution of those aspects of this case involving the alleged breach of the guarantees of any of the notes save Tikrit Note 1. The parties to the guarantees and the notes all are foreign. The obligations are denominated in foreign currencies. The place(s) for performance were abroad. The disputes may well implicate sensitive political matters with which courts are not equipped to deal. Accordingly, even if this Court has the power to adjudicate the claims with respect to the other notes, it would decline to do so.

*Personal Jurisdiction*

Once subject matter jurisdiction is established under the FSIA, the Act provides also for personal jurisdiction over Rafidain so long as service of process was properly made.[103] Rafidain objects to the exercise of personal jurisdiction on the grounds that Rafidain neither conducts business in the United States nor possesses minimum contacts with the United States sufficient to satisfy the constitutional requirements of due process.[104] The legislative history of the FSIA makes clear, however, that Section 1330(b) serves as a federal long-arm statute over foreign states and their instrumentalities and embodies the requirements of minimum jurisdictional contacts and adequate notice as

set forth in *International Shoe Co. v. Washington.*[105] The limited exceptions enumerated in Section 1605 require either a waiver of immunity or some connection between the lawsuit and the United States and therefore "prescribe the necessary contacts which must exist" before personal jurisdiction may be exercised.[106] In consequence, assuming Rafidain was properly served, both the statutory and constitutional requirements of due process have been satisfied, and this Court has personal jurisdiction over Rafidain.

*Statute of Limitations*

Because the Court has found that a material question of fact exists as to whether there is jurisdiction over the claim on the guarantee of Tikrit Note 1, it now addresses Rafidain's argument that this claim is time barred by Iraq's statute of limitations. Plaintiffs urge the Court to apply New York's six-year statute of limitations, while Rafidain asserts that Iraq's three-year statute of limitations applies, either because Iraq has a more significant interest in applying its law to this dispute or by operation of New York's borrowing statute.[107]

Statutes of limitations are regarded as part of a forum's procedure.[108] In consequence, New York's law governs the determination of whether plaintiffs' claim is time barred.

*The Borrowing Statute*

New York law contains a borrowing statute that requires application of either

102. *See Itar–Tass,* 140 F.3d at 448.

103. 28 U.S.C. § 1330(b).

104. Def. Rafidain's Mem. of Law in Support of Motion to Dismiss 25–30.

105. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See* H.R. Rep. No. 94–1487, § 2(b) (1976) (discussing personal jurisdiction under the FSIA).

106. H.R. Rep. No. 94–1487, § 2(b) (1976).

107. Def. Rafidain's Mem. of Law in Support of Motion to Dismiss 30–32.

108. *See Insurance Co. of North America v. ABB Power Generation, Inc.,* 925 F.Supp. 1053, 1059 (S.D.N.Y.1996). It has been held "an unreasonable burden on the judicial machinery of the forum" to require it to apply the procedural law of another court. *Bournias v. Atlantic Maritime Co.,* 220 F.2d 152, 154 (2d Cir.1955) (Harlan, J.). *See also FDIC v. Petersen,* 770 F.2d 141, 142 (10th Cir.1985); *Des Brisay v. Goldfield Corp.,* 637 F.2d 680, 682 (9th Cir.1981); Restatement (Second) Conflict of Laws § 122 cmt. a (1971).

Iraq's or Kuwait's statute of limitations to this dispute.[109] Section 202 of New York's Civil Practice Law and Rules reads:

"An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply." [110]

The purpose of the borrowing statute is to prevent plaintiffs from forum-shopping in an effort to take advantage of a longer statute of limitations than that to which they are entitled.[111] The statute applies in this case because none of the parties is a New York resident and the cause of action accrued outside of New York.

Although there has been confusion in the past as to where a nonresident's contract claim accrues for purposes of Section 202, this "long-simmering question" recently has been answered by the New York Court of Appeals in *Global Financial Corp. v. Triarc Corp.*[112] The court there held that both the "interest analysis" and the "center of gravity" tests are inapplicable under Section 202 and that a cause of action accrues where the alleged injury is sustained.[113] It stated also that "when an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." [114] Thus, even though we find that the nonpayment of Tikrit Note 1 may have had a direct effect in the United States sufficient to justify jurisdiction over plaintiffs' cause of action, plaintiffs "sustained the injury" in either Iraq or Kuwait. The Court need not decide which of the two it is for purposes of this analysis, since both fora have the same three-year statute of limitations and are "without" New York for purposes of Section 202. New York's borrowing statute therefore is applicable and requires that the action be timely under both New York law and the law of Iraq or Kuwait.

The New York statute of limitations for an action based on a contractual obligation or liability is six years.[115] Rafidain's breach took place on December 31, 1990 and plaintiffs filed their complaint in the instant action on August 1, 1996, making it timely under New York law. Iraqi Business Law, on the other hand, provides that an action for nonpayment of a promissory note shall not be heard more than three years from the date of maturity.[116] Kuwaiti business law contains an identical provision.[117] Because plaintiffs' action is not timely under either Iraq or Kuwait's statutes of limitations, it is time barred by New York's borrowing statute.

*The* Hanger *Doctrine and Equitable Tolling*

Plaintiffs argue that the Iraqi or Kuwaiti time limitation, as the case may be, should be equitably tolled due to the extraordinary circumstances of Iraq's hostile invasion and occupation of Kuwait.[118] Plaintiffs rely on *Hanger v. Abbott*,[119] which held that the statute of limitations was suspended during a period of war in which

109. N.Y. CPLR § 202 (McKinney 1999).

110. *Id.*

111. *Id.*, Supplementary Practice Commentaries, C202:3 (1998).

112. 93 N.Y.2d 525, 526, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999).

113. *Id.* at 529, 693 N.Y.S.2d 479, 715 N.E.2d 482.

114. *Id.*

115. N.Y. CPLR § 213 (McKinney 1999).

116. Powers Aff., Ex. B, Business Laws of Iraq, Vol. I (1990), Art. 135, 132.

117. Powers Aff., Ex. C, Business Laws of Kuwait, Vol. II (1998), Art. 502, 508.

118. Pl. Mem. 23–27.

119. 6 Wall. 532, 73 U.S. 532, 18 L.Ed. 939 (1867).

courts were closed to the plaintiff such that he was "rendered incapable to sue," [120] as well as the federal doctrine of equitable tolling.

■ The federal doctrine of equitable tolling has been held to encompass the *Hanger* doctrine.[121] It applies only to claims for which the applicable statute of limitations is provided by federal law. The Supreme Court has held that where a state statute of limitations applies, so also do the state tolling rules.[122] In *Hardin v. Straub*,[123] the Court found that " '[i]n virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling,' " [124] and has mandated that unless their full application would defeat federal policy, courts "should not unravel state limitations rules." [125] Because plaintiffs' claims are being heard in federal court pursuant to jurisdiction granted by the FSIA and Congress designed the FSIA to operate as a "pass-through" statute to state substantive law,[126] the matter of tolling is governed by New York law.

As noted previously, the New York borrowing statute requires that plaintiffs' claim be timely under the shorter of the New York or the applicable Iraqi or Kuwaiti statute of limitations. Moreover, the borrowing of either the Iraqi or the Kuwaiti statute requires the borrowing of the entire relevant foreign statute, fully encumbered with all of its "accoutrements," [127] including tolling rules. Just as New York's tolling provisions apply to the determination of the timeliness of an action under New York's time limitations, a foreign state's tolling rules apply in determining timeliness under foreign law.[128]

Plaintiffs do not suggest that the applicable foreign statute of limitations was tolled as a matter of the applicable foreign law by virtue of the Iraqi invasion and occupation of Kuwait. In consequence, the three year prescriptive period began to run upon the default on the guarantee in or about December 1990 and expired in or about December 1993, almost three years before the commencement of this action. Moreover, the result would be no different even if the New York tolling rules were applied to the three year limitations period under Iraqi or Kuwaiti law.

New York has codified its limitations of actions together with a number of tolling rules developed at common law,[129] the first of which expressly provides that "[n]o court shall extend the time limited by law for the commencement of an action" [130] beyond the extensions enumerated by statute. CPLR Section 209 articulates the circumstances in which New York time limitations toll in cases of war or enemy

120. *Id.* at 542.

121. *See, e.g., Softel, Inc. v. Dragon Medical and Scientific Communications Ltd.*, No. 87 Civ. 0167(MGC), 1995 WL 75490, *7–8 (S.D.N.Y. Feb 23, 1995) (collecting case law applying the doctrine); *O'Hara v. Bayliner,* 89 N.Y.2d 636, 646, 657 N.Y.S.2d 569, 574–75, 679 N.E.2d 1049 (1997).

122. *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) (reversing district and appellate courts' application of federal tolling rule to toll New York's statute of limitations).

123. 490 U.S. 536, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989).

124. *Id.* at 539, 109 S.Ct. 1998 (quoting *Johnson v. Railway Express Agency, Inc.,* 421 U.S.

454, 464, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)).

125. *Id.*

126. *Lloyds Bank PIC v. Republic of Ecuador,* No. 96 Civ. 1789(DC), 1998 WL 118170, *6 (S.D.N.Y. Mar. 16, 1998).

127. N.Y. CPLR § 202, Supplementary Practice Commentaries, C202:3 (1990).

128. *See Isenberg v. Ranier,* 145 A.D. 256, 130 N.Y.S. 27 (1st Dept.1911).

129. *See Tomanio,* 446 U.S. at 486, 100 S.Ct. 1790 (describing New York's statutory framework); *Leon v. Murphy,* 988 F.2d 303, 310 (2d Cir.1993).

130. N.Y. CPLR § 201 (McKinney's 1990).

occupation.[131] The statute provides that where a resident of a territory occupied by the government of a foreign country with which the United States or any of its allies is at war is entitled to commence an action, the time within which the action must be commenced does not include the period during which the territory is so occupied.[132] In an analogous case, the New York Court of Appeals tolled the statute of limitations of an action by the estate of a citizen of the Netherlands who, during German occupation of that country, was deported and never heard from again.[133] Similarly, plaintiffs in this case are citizens and residents of Kuwait, which was occupied from August 1990 to February 1991 by Iraq,[134] a foreign country with which the United States was at war during the period of occupation. Accordingly, plaintiffs' claim would be barred even if CPLR Section 209 were applied here. The prescriptive period would have begun to run in February 1991 and expired in February 1994.

### Conclusion

Rafidain's motion to dismiss the action as to it is granted. The dismissal is for lack of subject matter jurisdiction except that dismissal of the claim with respect to the breach of the guarantee of Tikrit Note 1 is on the ground that it is barred by the statute of limitations.

SO ORDERED.

(excluding from period of limitation the time during which Czechoslovakia, where the cause of action arose, was occupied by Germany).

---

131. *Id.* § 209.

132. *Id.* § 209(c).

133. *Gallewski v. H. Hentz & Co.,* 301 N.Y. 164, 93 N.E.2d 620 (1950). *See also Rabinovitch v. Auerbach,* 200 Misc. 77, 82–83, 100 N.Y.S.2d 923, 929–30 (Sup.Ct.N.Y.Co.1950)

