OPINION OF THE COURT
Ira Gammerman, J.
Introduction
This action involves a dispute over two insurance policies issued in connection with what is known as insurance-backed gap financing of film production. The Chase Manhattan Bank (Chase) provided funding to George Litto Pictures, Inc. (GLP), an entity established by producer George Litto, in two facilities: a $7.5 million working capital facility insured by a contingent extra expense policy, and an $89 million facility to fund the production of individual films. One film, “The Crew,” was produced, insured by a cash flow policy, providing coverage for approximately $24 million.
*582 On the contingent extra expense policy, New Hampshire Insurance Company (NH) was the fronting company and AXA Reassurance S.A. (AXA) was the reinsurer. On the cash flow policy, Underwriters Reinsurance Company (URC) was the fronting company, and AXA and Royal SunAlliance were the lead reinsurers. Both policies contained cut-through endorsements.[1]
The case was tried with a jury from October 29 to December 6, 2001. The jury found in favor of plaintiff Chase by finding that there was an agreement between AXA as reinsurer and URC as fronting company with respect to the language of the cut-through endorsement, and further that URC agreed to insure the loan advanced by the bank for the film The Crew on the policy terms that existed in the AXA reinsurance policy as of July 9, 1999.[2]
Both before and during the trial it was necessary to rule on several issues, including the effect of the “disclaimer” clauses, the choice of law applicable to the third-party action, and the defense of nonfortuity. Rulings on these issues were placed on the record but deserve more detailed discussion.
Choice of Law
AXA asserted that “where, as here, an action concerns laws regulating allegedly fraudulent conduct, the proper body of law to be applied turns on the locus of the tort,” and that *583 therefore French law governed its third-party claim against the broker.[3]
However, to conclude that French law applies on this basis would be to abandon the principles of governmental interest and revert, in effect, to the long-abandoned lex loci approach to conflict of laws.
In Cooney v Osgood Mach. (81 NY2d 66, 72 [1993]), the Court of Appeals observed that “If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders” (emphasis added).
The interest in regulating behavior taking place within a state’s borders is not vindicated by applying the law of a jurisdiction in which the behavior being regulated did not occur.[4] “We will not blindly apply a rule, disregarding its reason for being, to achieve a result it was created to avoid” (In re Drexel Burnham Lambert Group, Inc., 138 BR 687, 703 [SD NY 1992]).
A number of courts have tacitly or expressly recognized that since the purpose of applying the law of the government where the conduct occurred is to vindicate that government’s interest in regulating conduct within its borders, applying the law where economic injury occurred, when different from where the conduct occurred, fails to fulfill the purposes of the governmental interest test (see, AroChem Intl., Inc. v Buirkle, 968 F2d 266 [2d Cir 1992]; Saab v Citibank, N.A., 2001 WL 1382577, 2001 US Dist LEXIS 18115 [SD NY 2001]; Sussman v Bank of Israel, 801 F Supp 1068 [SD NY 1992], affd 990 F2d 71 [2d Cir 1993]; LaSalle Natl. Bank v Duff & Phelps Credit Rating Co., 951 F Supp 1071 [SD NY 1996]; see also, Zweig v National *584 Mtge. Bank of Greece, 1993 WL 227663, 1993 US Dist LEXIS 8460 [SD NY 1993]).[5]
A superficial reading of Ackerman v Price Waterhouse (252 AD2d 179 [1st Dept 1998]) might lend support to AXA’s position, but, even disregarding that Ackerman was decided prior to Global, a closer reading does not. Far from holding that the governing law would be the law of each plaintiffs residence (which would likewise be the “locus” of the economic injury and hence of the tort), the Court expressed (at 194) its “reservations concerning the IAS Court’s summary finding that the substantive law of the jurisdiction of each plaintiffs residence will apply to the contract claims of the global class.” The Court did not determine which body of law would apply, a complex issue that would have required a governmental interest analysis as to a multitude of potential jurisdictions. The Court also considered the potential effect of different applicable time bars under CPLR 202.
In Parrott v Coopers & Lybrand (263 AD2d 316 [1st Dept], affd 95 NY2d 479 [2000]), decided after Global, both the majority and the dissent based their conclusions that New York law applied, on a governmental interest analysis which did not enumerate the locus of the economic injury (New York) as a factor.
Any interest that France might possess in protecting its citizens from allegedly misleading conduct by a broker is not applicable in the context of the present case, involving a sophisticated entity engaged in complex international business dealings. Any such interest is outweighed by the substantial interest of France in ensuring that companies, and brokers in *585 particular, seeking to enter into sophisticated international financial transactions are not dissuaded from choosing French companies, lest they find themselves subject to duties imposed by a body of law which their reasonable expectations did not contemplate would govern their actions. Concomitantly, New York has an interest in this action in which a New York bank is a principal in an international transaction of this complexity and sophistication, against applying a body of law to the New York bank’s agent that was unanticipated by the parties. Such application would tend to chill the willingness of other brokers to work with potential business contacts overseas, lest they find themselves subject to laws beyond their expectations.[6]
Fortuity
Defendants AXA and NH both contend that they are not liable on the policies at issue because the losses were not fortuitous.
As stated in the scholarly article by Cozen and Bennett, Fortuity: The Unnamed Exclusion (20 Forum 222, 234 [Jan. 1985]), “[d]espite the age of the fortuity doctrine and its relatively universal acceptance by the courts * * * there are few cases which hold that a particular loss is, indeed, nonfortuitous and, therefore, excluded from coverage for that reason.” I conclude that this case weighs in favor of the correctness of that assessment. By their terms, the contingent extra expense *586 policy is governed by New York law, and the cash flow policy by Texas law.
Insurers contend[7] that the loss under the contingent extra expense policy is not fortuitous because (1) it was inevitable, as was known to Chase, that the loan could never be repaid, because, insurers assert, of the structure of the transaction,[8] and (2) the loss was within Chase’s own control. Insurers contend that any loss under the cash flow policy would be non-fortuitous under Texas law, because Chase did not require GLP to presell to foreign distributors, and therefore it was inevitable that foreign sales would be inadequate to prevent a loss. For purposes of this discussion, I assume, without deciding, that the insurers would have introduced evidence at trial to support their contentions of nonfortuity.
It is hornbook law that, if possible, a contract should be construed so as to avoid an unreasonable result (see, 22 NY Jur 2d, Contracts § 219, and cases there cited). Further, it has long been the rule in New York that if a contract “may be construed in more senses than one, such construction should be adopted as will be more beneficial to and as understood by the promisee” (O’Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50, 54, mot denied 280 NY 687 [1939]; see also, Posner v United States Fid. & Guar. Co., 33 Misc 2d 653 [Sup Ct, Sullivan County 1962], affd sub nom. Posner v New York Mut. Underwriters, 16 AD2d 1013 [3d Dept 1962] [involving insurance policy]).
More specifically with regard to insurance policies, it has long been the law in New York that an insurance policy “must be given a fair and reasonable interpretation to cover the risks which the parties had reason to anticipate, and had reason to *587 believe would be met by the policy” (Underwood v Globe Indem. Co., 245 NY 111, 114 [1927]; see also, 2 Couch on Insurance 3d § 21:9 [“Only legal necessity warrants a construction that defeats the intent of the parties to provide protection against loss, thereby precluding a recovery on the policy, or that limits the effect of the contract so that it is practically valueless”]).
As stated by the Second Circuit in National Union Fire Ins. Co. of Pittsburgh, Pa. v Stroh Cos., Inc. (265 F3d 97, 106 [2d Cir 2001]):
“Broadly stated, the fortuity doctrine holds that ‘insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur.’ Barry R Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 8.02, at 248 (5th ed. 1991) (collecting cases). New York has codified a somewhat narrower version of the doctrine * * * ” (emphasis added).
That codification is set forth in Insurance Law § 1101 (a):
“1101. Definitions; doing an insurance business
“(a) In this article: (1) ‘Insurance contract’ means any agreement or other transaction whereby one party, the ‘insurer’, is obligated to confer benefit of pecuniary value upon another party, the ‘insured’ or ‘beneficiary’, dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.
“(2) ‘Fortuitous event’ means any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party” (emphasis added).
It is undisputed that the contract creating the contingent extra expense policy was intended by all parties to be an insurance policy, governed by New York law, as thus defined by section 1101. Therefore, ipso facto, the contract must be construed, if reasonably possible, to give effect to the parties’ intent that it be an insurance policy as thus defined.
What distinguishes this case from the cases cited by the insurers, typically involving all risk or general liability policies, is that here, each of these two policies provided coverage for only a single potential loss. Therefore, if the contingent extra expense policy did not provide coverage for the loss *588 because, as the insurers contend, any loss was nonfortuitous, it provided coverage for nothing.
Under the above-quoted definition in Insurance Law § 1101 (a), a contract is not an insurance policy unless it covers some fortuitous event. Therefore, to give effect to the parties’ intent, including AXA’s intent, that the contract constitute an insurance policy, it must be construed as covering a fortuitous event. Otherwise, under New York law, it is not an insurance policy as the parties intended.
Assuming, arguendo, that the sole loss that is the subject of the policy was, as the insurers contend, inevitable because of the inherent structure of the transaction (whether or not known to Chase), or under Chase’s own control, this does not mean that under New York law the event resulting in the loss was not “fortuitous.” As quoted above, an event resulting in a loss is “fortuitous” under New York law so long as it “is assumed by the parties to be, to a substantial extent beyond the control of either party” (emphasis added) even if, in fact, it was not.
Accordingly, the only reasonable construction of the policy is that under it, the parties contractually assumed the loss — the sole loss contemplated by the policy — to be “to a substantial extent beyond the control of either party.”
This conclusion is compelled even if, as AXA posits alternatively and hypothetically, the loss was not inevitable under the policy’s initial inception, but became so later on because of changes in the transaction.[9] Fortuity is judged from the outset of the policy (see, CPH Intl., Inc. v Phoenix Assur. Co. of N.Y., 1994 WL 259810, 1994 US Dist LEXIS 7751 [SD NY 1994]; see also, Stonewall Ins. Co. v Asbestos Claims Mgt. Corp., 73 F3d 1178 [2d Cir 1995], mod on other grounds 85 F3d 49 [2d Cir 1996]).
Therefore, whether, as the insurers contend, the loss was, in actual fact, inevitable, and whether, as the insurers contend, the loss was, in actual fact, within Chase’s own control, are moot issues for purposes of this action. As a matter of New York law, the loss was “fortuitous” because the parties *589 contractually assumed it to be “to a substantial extent beyond the control of either party.” Any other result, rendering the coverage provided by this single-loss policy, illusory, would be an unreasonable result and would be inconsistent both with the parties’ undisputed intent that the contract be an insurance policy as defined by New York law, and with the other above-stated rules governing contractual construction.
Even in the absence of this portion (“assumed by the parties to be”) of the statutory definition, and even if, arguendo, the insurers could establish that the loss is not fortuitous within the common-law meaning of the term, I conclude that under New York law, nonfortuity is not available to the insurers here to withstand the claim.
“The policy rationale for the fortuity doctrine is simple. When parties enter into an insurance contract, they are, in effect, making a wager as to the likelihood that a specified loss will occur. If the loss has already occurred, or the insured knows that the loss is certain to occur for reasons not disclosed to the insurer, then the insurance contract is not a fair bet.” (CPH Intl., Inc. v Phoenix Assur. Co. of N.Y., 1994 WL 259810, *6, 1994 US Dist LEXIS 7751, *18 [SD NY 1994], supra [citation omitted].)
As stated in 7 Couch on Insurance 3d § 102:8: “Given the underlying basis of the doctrine, and the right of the parties to agree to cover existing losses, it has been recognized that the known loss doctrine does not apply if the insurer also knew of the circumstances on which it bases the defense.” (Emphasis added; see also, e.g. General Housewares Corp. v National Sur. Corp., 741 NE2d 408, 414 [Ind 2000], citing Couch § 102:8, and holding, “[t]his is not to say, however, that parties may not explicitly agree to cover existing losses.”)
Here, there is no triable issue as to whether the insurers “knew of the circumstances on which it bases the defense” (Couch § 102:8). The structure of the transaction, and the scope of Chase’s rights, as they existed at the time, were set forth in writing and fully disclosed to the insurers at the time the policy was issued, and, as discussed below, the disclaimer clauses in the policies preclude any claim of fraud. Since the insurers necessarily knew how the transaction was structured, the insurers cannot contend, for example, that, because it was inevitable that GLP would be unable to commence five pictures so as to generate the funds to repay the loan, the loss was a “known loss” and therefore nonfortuitous.
*590 The insurers’ complaint that their underwriter and attorney did not understand the transaction is not grounds for depriving Chase of the benefits of the bargain it made (cf., Societe Nationale D’Exploitation Industrielle Des Tabacs Et Allumettes v Salomon Bros. Intl., 268 AD2d 373 [1st Dept], lv denied 95 NY2d 762 [2000]). An insured’s rights under the policy may not be avoided by the insurer’s complaint that its own agent failed to adequately protect the insurer’s interests (see, Lampke v Metropolitan Life Ins. Co., 279 NY 157, 165 [1938] [“To permit an insurance company to accept the payment of premiums on a policy which it knew when issued was void from its inception would constitute a fraud on the policyholder”]; Holmes v Nationwide Mut. Ins. Co., 40 Misc 2d 894 [Sup Ct, Broome County], affd 19 AD2d 947 [3d Dept 1963]).
This principle is even more compelling here, in view of the disclaimer clauses.
While the parties do not dispute that the definitions in Insurance Law § 1101 define “fortuitous” for purposes of the contingent extra expense policy, on the face of the statute the application of those definitions is limited to article 11 (Licensing of Insurers), which governs what activities require licensing by the New York State Department of Insurance (see, Feinstein v Attorney-General of State of N.Y., 36 NY2d 199 [1975]). Nevertheless, New York appellate courts have applied the statutory definition to contractual disputes between insurers and insureds.
Neither the parties, nor the Second Circuit in its recent decision in National Union Fire Ins. Co. of Pittsburgh, Pa. v Stroh Cos., Inc. (265 F3d 97 [2d Cir 2001], supra), or its earlier decisions in City of Johnstown v Bankers Std. Ins. Co. (877 F2d 1146 [2d Cir 1989]), and Stonewall Ins. Co. v Asbestos Claims Mgt. Corp. (73 F3d 1178 [2d Cir 1995], supra) cite any New York Court of Appeals case holding that, as a matter of law, even in the absence of a policy exclusion, a loss is not covered unless it is fortuitous.
Nevertheless, it is axiomatic that, in the absence of Court of Appeals authority to the contrary, I am bound by the decisions of the Appellate Division (see, Cohoes Realty Assoc. v Lexington Ins. Co., Sup Ct, NY County, May 18, 2000, Gammerman, J., Index No. 502594/96, mod on other grounds 292 AD2d 51 [1st Dept 2002]), and accordingly, those decisions must be followed in adjudicating this dispute. Moreover, subsequent. to the conclusion of this trial, the Court of Appeals issued its decision in Consolidated Edison Co. of N.Y. v Allstate Ins. Co., 98 NY2d 208 [2002]), discussing the issue of fortuity.
*591 Cases in which the intermediary New York State appellate courts construe the doctrine are relatively few and say little about the particulars of the doctrine. Among the principles that may be discerned from those decisions,[10] are the following:
a. The fortuity doctrine is part of New York law;
b. The definition set forth in section 1101 constitutes a substantive codification of the rule and is applicable to disputes between insureds and insurers; and
c. As between insurers and insureds, a loss may be nonfortuitous even if it is “fortuitous” within the four corners of the statutory definition. A known loss is nonfortuitous.
In Consolidated Edison Co. of N.Y. v Allstate Ins. Co. (supra), one of the issues before the Court of Appeals was who had the burden of proof. The Court cited the definitions of “insurance contract” and “fortuitous event” in Insurance Law § 1101 (a), and stated further (at 220):
“Thus, the requirement of a fortuitous loss is a necessary element of insurance policies based on either an ‘accident’ or ‘occurrence.’ The insured has the initial burden of proving that the damage was the result of an ‘accident’ or ‘occurrence’ to establish coverage where it would not otherwise exist [citing Northville Indus. Corp. v National Union Fire Ins. Co., 89 NY2d 621 (1997)]. Once coverage is established, the insurer bears the burden of proving that an exclusion applies.” (Emphasis added.)
*592 The Court of Appeals’ use of the word “thus,” immediately following the definitions in section 1101 (a), confirms that those definitions are relevant to contractual disputes between insurers and insureds, even though on the face of the statute, the definitions apply only to issues of whether an entity must be licensed by the Department of Insurance.
This holding, while of course binding on all New York courts, does not precisely resolve the issue presented in this case, which is whether the contingent extra expense policy is enforceable even if (disregarding the “assumed to be” portion of the statutory definition) the loss herein was nonfortuitous. The Court’s observation that insurance policies “generally” require “fortuity” necessarily implies that fortuity is not an absolute requirement. Moreover, while the Court might have stated that “the requirement of a fortuitous loss is a necessary element of all insurance policies,” it did not do so: on its face, the Court’s holding is restricted to “insurance policies based on either an ‘accident’ or ‘occurrence.’ ”
The issue of fortuity and known loss under New York law was addressed by the Second Circuit in City of Johnstown v Bankers Std. Ins. Co. (877 F2d 1146 [2d Cir 1989], supra), Stonewall Ins. Co. v Asbestos Claims Mgt. Corp. (73 F3d 1178 [2d Cir 1995], mod on other grounds 85 F3d 49 [2d Cir 1996], supra), and, very recently, in National Union Fire Ins. Co. of Pittsburgh, Pa. v Stroh Cos., Inc. (265 F3d 97 [2d Cir 2001], supra). While not binding, and while decided prior to Consolidated Edison, these decisions contain useful discussions of New York law.
The court in National Union ultimately declined to reach the issue whether under New York law the “known loss” doctrine overrides policy provisions.[11] Rather, the court concluded that the doctrines of fortuity and known loss were inapplicable to the facts before it, because (at 108): “Even if the risk was known, and known to be high, at that time — a question hotly in dispute — the known loss doctrine does not bar coverage.”
Rejecting the insurer’s argument that allowing the insured to recover for such a claim would leave insurers vulnerable to misconduct, the Second Circuit held (at 112):
“the insurer in National Union’s example may protect itself by requiring the insured to disclose *593 any problems with buildings added to the policy after the original inception date, just as National Union was free to ask Stroh of any known or potential problems associated with Heileman’s assets prior to adding Heileman’s assets to Policy coverage.”
Here, far from requiring the insured to disclose facts relevant to the risk, the insurers expressly waived such a requirement.
The doctrine that an insured may not recover under an insurance policy for a nonfortuitous loss is grounded in public policy, and is a corollary of the principle that one may not recover on an illegal contract.[12] In applying the doctrine, it is
“well to remember too that ‘the right of private contract is no small part of the liberty of the citizen, and the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare.” (Miller v Continental Ins. Co., 40 NY2d 675, 679 [1976], quoting Baltimore & Ohio Ry. Co. v Voigt, 176 US 498, 505 [1900].)
That is,
“the Court must balance the weight of the public policy at issue, and the extent to which enforcement of the contract undermines the policy, against the public interest in seeing private agreements enforced. See New England Mutual Life Ins. Co. v Caruso, [73 NY2d 74 (1989)] (finding that penal statute sufficiently deterred disfavored conduct so public interest did not require voiding contract).” (Hoffman v Empire Blue Cross & Blue Shield, 1999 WL 782518, *5, 1999 US Dist LEXIS 15365, *15 [SD NY 1999]; see also, Twin City Pipe Line Co. v Harding Glass Co., 283 US 353 [1931].)
The decision of the Court of Appeals in New England Mut. Life Ins. Co. v Caruso (73 NY2d 74, rearg denied 74 NY2d 651 [1989]) provides an instructive analogy. At issue was whether the insured had an insurable interest in a policy, and whether the insurer could assert that the policy was void because of the *594 lack of such insurable interest notwithstanding the passage of the statutory contestability period.[13]
Rejecting the insurer’s arguments that based on public policy the insurance policy was void ab initio and hence not subject to statutory periods of contestability, the Court of Appeals held (at 81): “a decision to refrain from enforcing a particular agreement depends upon a balancing of the policy considerations against enforcement and those favoring the encouragement of transactions freely entered into by the parties.”
This is consistent with Court of Appeals precedent on the issue of illegal contracts in general, even where the public policy has been expressed in a statute, so long as the violation is merely malum prohibitum (see, Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d 124, 127-128 [1992] [“If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy * * * the right to recover will not be denied * * * forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as ‘a sword for personal gain rather than a shield for the public good’” (citations omitted)]; see also, Denburg v Parker Chapin Flattau & Klimpl, 82 NY2d 375 [1993], citing Lloyd Capital; General Venture Capital Corp. v Wilder Transp., 26 AD2d 173 [1st Dept 1966]; Wowaka & Sons v Pardell, 242 AD2d 1 [2d Dept 1998]; cf., Abramovitz v Kew Realty Equities, 180 AD2d 568 [1st Dept], lv denied 80 NY2d 753 [1992] [applying equitable principles to permit recovery on criminally usurious loan]).
Clearly, agreements to pay a lender if a borrower defaults are not malum per se. Here, while the parties opted to cast their agreement in the form of an insurance policy rather than an outright guaranty, the terms of the loan as they then existed were fully disclosed to the insurers, who affirmatively contracted to rely on their own investigation and analysis, thus precluding any contention of fraud. Therefore to the extent that the public policy against insurance of nonfortuitous losses *595 is grounded in concerns relating to fraud, they are not applicable.
I do not read the Court of Appeals holding in Consolidated Edison as overruling or limiting these holdings, or holding them inapplicable to fortuity issues. To the contrary, in analyzing the issues relating to fortuity, the Court of Appeals took public policy balancing into account.
Here, important competing public policy considerations militate against permitting the insurers to assert any claimed nonfortuity to avoid payment.
As noted above, in Lampke v Metropolitan Life Ins. Co. (279 NY 157, 165 [1938]), the Court of Appeals held “To permit an insurance company to accept the payment of premiums on a policy which it knew when issued was void from its inception would constitute a fraud on the policyholder.” (See also, Holmes v Nationwide Mut. Ins. Co., 40 Misc 2d 894 [Sup Ct, Broome County 1963], affd 19 AD2d 947 [3d Dept 1963], supra; New York Life Ins. Co. v Baum, 700 F2d 928 [5th Cir 1983], supra [applying New York law, citing Holmes].)
The policy here was issued in the context of a multifaceted, highly sophisticated, complex transaction whose focused purpose was to provide funding for GLP’s business plans. Unlike typical insurance scenarios, where the insurer issues a policy in return for a fixed, stated premium, a side agreement between GLP and AXA gave AXA a right to a fixed percentage of GLP’s net profits, in the form of “deferred premiums.” In effect, by issuing the policy as a substitute for collateral or a guaranty, AXA induced Chase to issue a loan to provide funding for an entity in which AXA had an appreciable investment interest.
To allow the insurers to use fortuity as a sword, rather than a shield, to avoid their obligations under the policy would mean they issued a supposed “policy” that afforded no coverage whatsoever because of facts of which the insurers were on notice at the time the policy was issued, facts that the insurers affirmatively contracted that the insured was not required to disclose. It would mean that the document that the insurers insist is a policy of insurance lacked the fundamental characteristic that they assert a policy of insurance must have: a sharing of risks. Under this argument, there was no risk to the insurers at all. It would mean that AXA induced Chase to provide uncollateralized funding for an endeavor in which AXA had a risk-free investment.
Public policy does not tolerate such a result.
*596 One final issue, while not the basis for my decision, deserves mention.
While courts in other jurisdictions have viewed nonfortuitous claims under insurance policies as barred by public policy, and while decisions of the New York subordinate appellate courts, binding on me, have held nonfortuitous claims barred, I note that the definitions in Insurance Law § 1101 are, ipso facto, only definitions. An entity that engages in the insurance business, by, for example, selling policies as defined in section 1101 in New York, without being licensed to do so, violates the law. However, the “violation” is not of the definition, but of Insurance Law § 1102, the substantive statute that prohibits doing insurance business as thus defined, without being licensed to do so (see, Feinstein v Attorney-General of State of N.Y., 36 NY2d 199 [1975]; see also, Electronic Realty Assoc. v Lennon, 94 Misc 2d 249 [Sup Ct, Duchess County 1978], mod on other grounds 67 AD2d 997 [2d Dept], lv denied 47 NY2d 705 [1979]). An entity that sells what purports to be an insurance policy, but which “insures” against nonfortuitous events, does not “violate” any statute.
In Loring & Assoc. v Continental Cas. Co. (56 NY2d 848, 850 [1982]), the Court of Appeals held: “Inasmuch as the particular clause in question did not violate any statutory mandate or prohibition or any regulation of the Superintendent of Insurance, this court cannot say that the clause was violative of public policy.” (See also, American Home Assur. Co. v McDonald, 274 AD2d 70 [1st Dept 2000]; Kern v John Hancock Mut. Life Ins. Co., 8 AD2d 256 [1st Dept 1959], affd 8 NY2d 833 [1960].)
This supports the conclusion that, since issuance of a contract in the form of an insurance policy but covering nonfortuitous losses does not violate any statute or regulation, it does not violate public policy.
Moreover, it is a principle of statutory construction that “[t]he failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended” (Pajak v Pajak, 56 NY2d 394, 397 [1982]). Here, the Legislature focused on fortuity, defined it, but chose to limit its applicability to defining what kinds of contracts could be entered into only by entities licensed to do insurance business. By implication, insurers that fail to protect themselves from nonfortuitous claims by including appropriate language in their policies may not rely on public policy to avoid their contractual obligations.
*597 AXA contends that under Texas law a loss is nonfortuitous if it is the “natural and probable” consequence of intentional conduct; that “Texas courts will not allow coverage where intentional conduct results in foreseeable harm, even if the insured did not intend to harm the injured individual”; that “[t]he fortuity doctrine precludes insurance coverage where offending conduct was intentional”; and that “the natural and probable consequences of an insured’s intentional acts cannot be fortuitous.” However, the cases cited by AXA for these propositions demonstrate that, while the courts use the terms “natural and probable” in this context, they construe these terms, at least in the context of first-party claims, as meaning inevitable[14] (see, Scottsdale Ins. Co. v Travis, 68 SW3d 72, 75 [Tex App 2001] [“the doctrine (of fortuity) has its roots in the prevention of fraud; because insurance policies are designed to insure against fortuities, fraud occurs when a policy is misused to insure a certainty”]; Bituminous Cas. Corp. v Vacuum Tanks, Inc., 75 F3d 1048 [5th Cir 1996] [no coverage for inevitable results which predictably and necessarily emanate from deliberate actions]).
Disclaimers
At the outset of the trial I granted Chase’s motion in limine to bar evidence of fraud based on certain clauses in the policies (the “disclaimer” clauses).
AXA contends that the disclaimers cannot apply to facts within the peculiar knowledge of the party making the alleged misrepresentation. There is some support for this proposition in the case law. In Tahini Invs. v Bobrowsky (99 AD2d 489 [2d Dept 1984]), the Second Department read Danann Realty Corp. v Harris (5 NY2d 317 [1959]) as recognizing an exception to the efficacy of a specific disclaimer, where the subject of the misrepresentation is within the representor’s peculiar knowledge.[15] Federal courts, citing Tahini, have likewise recognized this exception, as has the First Department in Steinhardt Group v Citicorp (272 AD2d 255 [1st Dept 2000]). *598 However, assuming, arguendo, that this principle is good law in the First Department,[16] it is not applicable here.
*599 In Rodas v Manitaras (159 AD2d 341, 343 [1st Dept 1990]), the First Department, citing Tahini, referred to the “exclusive knowledge” exception, but held
“where, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.”
In Rodas (at 342), plaintiffs requested examination of business records and were refused access. The First Department held this put them on notice “that the income of the business was a material fact in which they had received no documentation.” There was no actual notice, however, that the information given to them was false. Rodas was cited on this issue by the First Department in Schwartz v Ross (233 AD2d 229 [1st Dept 1996]); in Meltzer v G.B.G., Inc. (176 AD2d 687 [1st Dept 1991]); and, more recently, by Judge Sweet in Emergent Capital Inv. Mgt., LLC v Stonepath Group, Inc. (195 F Supp 2d 551 [SD NY 2002]).
Meltzer is especially analogous. In Meltzer, the plaintiffs accepted a copy of a relevant contract in redacted form. The Court (at 689) held that “[t]he plaintiffs, by fully accepting the Conjo contract in a redacted form as part of the sales contract, willingly assumed the business risk that the facts might not have been as represented.”
The disclaimers here are not mere disclaimers of reliance. AXA contractually recognized that there might be misstatements or omissions, waived any obligation on Chase’s part to speak, acknowledged that only very limited specified information had been provided by Chase, and agreed that the policy could not be avoided even if, e.g., the broker were guilty of misstatements or omissions. This constituted, in effect, acceptance by AXA of a “redacted” form of the facts, to wit, the very limited information that, under the clause, was acknowledged as having been provided by Chase. The insurers will not be heard to complain that Chase did not do what the insurers contractually agreed Chase did not have to do, and that Chase is *600 responsible for what the insurers contractually agreed Chase was not responsible.

. Prior to the time claim could be made on either policy, AXA instituted an action seeking a declaratory judgment that it was not liable on the reinsurance policies. Subsequently, AXA asserted claims against, inter alia, Stirling Cooke Brown Reinsurance Brokers Ltd. (the broker), and Sawtantar Sharma (the broker’s employee) and Stirling Cooke Brown Holdings, Ltd. (a related entity) (these three entities collectively SCB). Once a default occurred on the $7.5 million policy and the right to assert a claim on the $7.5 million policy matured, Chase instituted an action to recover on that policy. The two actions were consolidated so that all issues could be resolved in one trial. As a result of the consolidation, Chase became the plaintiff; NH (which was granted leave to intervene), and AXA the defendants; and SCB the third-party defendants. In addition, a cross claim was asserted by NH against AXA under the reinsurance policy. AXA resisted that claim contending that because of nonpayment of the premium or the delay in its transmittal, AXA had no obligation to NH on the $7.5 million policy.

. With respect to the third-party action by both AXA and NH, the jury found that Sharma did not intentionally make any material statements that were either false or recklessly false, and did not intentionally and with an intent to deceive, fail to provide information to AXA that should have been provided in the exercise of “utmost good faith.”

. AXA did not identify any conduct within France sufficient to justify applying French law to vindicate French interests.

. With regard to an analogous, albeit distinguishable, issue of long-arm jurisdiction, New York does not extend its long-arm jurisdiction to conduct occurring outside New York, merely because that conduct results in economic injury within New York (see, Chase Manhattan Bank v AXA Reins. UK PLC, Sup Ct, NY County, Aug. 2, 2001, Sept. 10, 2001, Gammerman, J., Index Nos. 603080/00, 591030/00, affd for reasons stated below 294 AD2d 245 [1st Dept 2002], citing Bank Brussels Lambert v Fiddler Gonzalez & Rodriguez, 171 F3d 779 [2d Cir 1999], and Hermann v Sharon Hosp., 135 AD2d 682 [2d Dept 1987]).

. Cases involving CPLR 202 have no application to the adjudication of substantive choice of law questions (Global Fin. Corp. v Triare Corp., 93 NY2d 525 [1999]). In light of Global, cases adjudicating CPLR 202 issues, such as Smith, Barney, Harris Upham & Co. v Luckie (85 NY2d 193, rearg denied 85 NY2d 1033, cert denied sub nom. Manhard v Merrill Lynch, Pierce, Fenner & Smith, 516 US 811 [1995]) are wholly inapposite to the substantive choice of law question in this case. Likewise, cases that apply a formalistic test to substantive issues, relying on cases adjudicating CPLR 202 disputes or cases citing such cases (see, e.g., Rosenberg v Pillsbury Co., 718 F Supp 1146 [SD NY 1989], citing Sack v Low, 478 F2d 360 [2d Cir 1973] [a CPLR 202 case, to adjudicate a substantive choice of law issue]) are not good authority for adjudication of choice of law as to substantive issues.
Courts subsequent to Global have so recognized (see, e.g., Bank Brussels Lambert v Credit Lyonnais [Suisse] S.A., 2001 WL 492363, 2001 US Dist LEXIS 5880 [SD NY 2001]; Dar El-bina Eng’g & Contr. Co., Ltd. v Republic of Iraq, 79 F Supp 2d 374 [SD NY 2000]; In re Gaston & Snow, 243 F3d 599 [2d Cir], cert denied sub nom. Erkins v Bianco, 534 US 1042 [2001]).

. Other factors likewise support the conclusion that French law does not apply. While the choice of law provisions in the insurance policies themselves are not necessarily dispositive of the tort claims, they are significant in that they reflect the parties’ expectation that French law would not govern their contractual disputes. Chase, the insured, is an American entity. Further, despite the provisions in CPLR 3016 (e) for pleading of foreign law, no French law is asserted within any of the 218 paragraphs in the counterclaim/third-party complaint, a factor which implies that AXA did not have French law in mind when it dealt with the broker.
In view of Odyssey Re {London) Ltd. v Stirling Cooke Brown Holdings Ltd. (85 F Supp 2d 282 [SD NY 2000], affd 2001 WL 46565, 2001 US App LEXIS 744 [2d Cir 2001]), a case bearing remarkable similarities to the case at bar, and which suggests that the broker’s duty and liability might well be governed by British law, I invited the parties to address whether British law should govern the broker’s duty and liability. While both AXA and the broker submitted affidavits of English law and memoranda of law, neither side’s briefing asked that English law be applied rather than New York law. Especially in view of the sophistication of the parties and counsel in this case, and the very real potential for prejudice if I were to apply (with no notice till mid-trial) a body of law not raised by the parties, I determined that English law would not be applied.

. The precise arguments made by AXA and NH are not identical. Moreover, NH’s arguments are directed only toward the contingent extra expense policy. For the sake of simplicity, however, I will refer to the arguments as having been made by “insurers.”

. While older cases held that a loss resulting from the innate structure of the insured property is nonfortuitous, “Moss caused by an inherent defect that made the damage inevitable has nonetheless been held to be fortuitous under the modem rule” (Cozen and Bennett, Fortuity: The Unnamed Exclusion, 20 Forum 222, 245 [Jan. 1985], supra). Cases such as Vasile v Hartford Acc. & Indem. Co. (213 AD2d 541 [2d Dept 1995]), involving the eifect of time on the producing capabilities of a 22-year-old well, are factually distinguishable. The decision in 525 Fulton Holding Corp. v Mission Natl. Ins. Co. (256 AD2d 243 [1st Dept 1998], lv dismissed 93 NY2d 1012, rearg denied 94 NY2d 839 [1999]) implies that had the damage been caused by pipe corrosion, i.e., resulting from the inherent quality of the structure itself, the loss would have been fortuitous.

. If, as the insurers contend, the loss was inevitable ab initio because of the innate structuring of the transaction, any modifications to the transaction, including any factors placed within Chase’s own control, could not have made the loss “more inevitable.” There are no degrees of inevitability. If the “inevitability” could be increased, then, ipso facto the initial “inevitability” was not “inevitability” but merely risk, which, regardless of how high, is not nonfortuitous.

. See, 525 Fulton Holding Corp. v Mission Natl. Ins. Co., 256 AD2d 243 (1st Dept 1998), Iv dismissed 93 NY2d 1012, rearg denied 94 NY2d 839 (1999), supra; Vasile v Hartford Ace. & Indem. Co., 213 AD2d 541 (2d Dept 1995), supra; Modell & Co. v General Ins. Co. of Trieste & Venice, 193 AD2d 412 (1st Dept 1993); New York State Elec. & Gas Corp. v Lexington Ins. Co., 204 AD2d 226 (1st Dept 1994); A&B Enters, v Hartford Ins. Co., 198 AD2d 389 (2d Dept 1993); Danzeisen Realty Corp. v Continental Ins. Co., 170 AD2d 432 (2d Dept 1991); 80 Broad St. Co. v United States Fire Ins. Co., 88 Mise 2d 706 (Sup Ct, NY County 1975), affd 54 AD2d 888 (1st Dept 1976), Iv denied 42 NY2d 801 (1977).
Cases involving application of express policy language, e.g., 80 Broad St. Co. v United States Fire Ins. Co. (supra), while sometimes cited on the fortuity issue (see, e.g., New York State Elec. & Gas Corp. v Lexington Ins. Co., supra; Vasile v Hartford Acc. & Indem. Co., 213 AD2d 541 [2d Dept 1995], supra), arguably provide only limited support for the application of the doctrine as a matter of common law (see, Stonewall Ins. Co. v Asbestos Claims Mgt. Corp., 73 F3d 1178, supra [“known loss” defense is “distinct” from a defense based on policy language excluding coverage for injuries that were “expected or intended” by the insured]; but cf. Consolidated Edison Co. of N.Y. v Allstate Ins. Co., supra [citing statutory definition in determining burden of proof in case involving construction of policy language]).

. Unlike a lower New York court, a federal court is not bound by the decisions of the Appellate Division, but is charged, instead, with predicting how the New York Court of Appeals would rule on an issue.

. Contracts against public policy are deemed illegal (see, Johnston v Fargo, 184 NY 379 [1906]).

. The concept of “insurable interest” is inherent in insurance, is grounded in public policy against wagering (see, Holmes v Nationwide Mut. Ins. Co., 40 Misc 2d 894 [Sup Ct, Broome County 1963], affd 19 AD2d 947 [3d Dept 1963], supra; New York Life Ins. Co. v Baum, 700 F2d 928 [5th Cir], on reh 707 F2d 870 [1983] [applying New York law, citing Holmes]), and, like fortuity, is included in the statutory definition contained in Insurance Law § 1101 (a) (1) (“a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event” [emphasis added]).

. In the context of third-party claims, different public policy issues come into play against indemnifying an insured for his intentional harm of a third person.

. This would appear to be a misreading of Danann. The language in Danann (5 NY2d at 322), on which Tahini appears to rely, describes general principles applicable to fraud claims, and cites Schumaker v Mather (133 NY 590 [1892]), a case that involved neither a disclaimer nor the effect of a disclaimer. (Tahini also cited O’Keeffe v Hicks, 74 AD2d 919 [2d Dept 1980], a case involving a nonspecific, general merger and disclaimer clause.)
*598 Under those general principles, “[a] claim of fraud will not lie if, inter alia, the misrepresentation allegedly relied upon was not a matter within the peculiar knowledge of the party against whom the fraud is asserted, and could have been discovered by the party allegedly defrauded through the exercise of due diligence” (Cohen v Cerier, 243 AD2d 670, 672 [2d Dept 1997], citing Danann). Therefore, if a disclaimer did not protect against a misrepresentation within the peculiar knowledge of the speaker, it would provide no more protection than would no disclaimer at all.

. The holding in Tahini appears inconsistent with First Department precedent. In Goldstein Prods, v Fish (198 AD2d 137, 137 [1st Dept 1993]), the alleged fraud was that “defendant Peter Fish, a former employee, had fraudulently induced the plaintiffs into executing a Settlement Agreement terminating their business relationship by orally misrepresenting that he would not thereafter be employed by defendant National, plaintiffs’ major competitor,” something within Fish’s own peculiar knowledge. The First Department held that the claim was barred by the disclaimer clause.
Tahini also appears inconsistent with the decision of the Court of Appeals in Gaidon v Guardian Life Ins. Co. of Am. (94 NY2d 330, 345 [1999]), where the Court of Appeals, while upholding claims under the consumer fraud statute, held that the arguments based on the disclaimer and merger clauses were “compelling when resisting plaintiffs’ claims of fraud.” It would appear anomalous to allow insurers to rely on disclaimer clauses to shield themselves from claims of fraud as to matters within the insurers’ peculiar knowledge, while at the same time hold that the insured in this case may not rely on disclaimer clauses as to matters allegedly within the insured’s own peculiar knowledge.
See also, Frith v Guardian Life Ins. Co. of Am. (9 F Supp 2d 744 [SD Tex 1998] [cited by the New York Court of Appeals in Gaidon, supra-, applying Texas law; dismissing fraud claims in vanishing premium case based on disclaimer and merger clauses]).
The First Department’s decision in Societe Nationale D’Exploitation Industrielle Des Tabacs Et Allumettes v Salomon Bros. Inti. (268 AD2d 373 [1st Dept 2000], supra), rejecting a “peculiar knowledge” argument, also supports the conclusion that there is no “peculiar knowledge” exception to an otherwise effective disclaimer.
Subsequently, however, Tahini was cited with approval by the First Department in Steinhardt Group v Citicorp (272 AD2d 255 [1st Dept 2000], supra). As in Societe Nationale, this issue was an alternative ground for the Court’s decision, and was thus not dispositive: in Steinhardt Group the First Department held that the disclaimer in question was not specific enough to meet Danann standards. Thus, the issue of whether the disclaimer was otherwise effective was moot. Steinhardt was issued a mere four months after Societe Nationale by a bench that included two justices who were on the bench in Societe Nationale, one of whom was also on the two First Department benches whose decisions were affirmed (as to the fraud claims) by the Court of Appeals in Gaidon. Yet Steinhardt does not purport to distinguish or overrule Societe Nationale, nor does it purport to distinguish Gaidon. The state of the law on this issue is thus not entirely clear.