Chief Judge Breitel.
These appeals, jointly argued, present the issue whether the Appellate Division properly withhold its approval, under subdivision 5 of section 495 of the ’ Judiciary Law, of two proposed plans for prepaid legal services. The Appellate Division grounded -its action on the lack of statutory authority, personnel, and Resources to approve or oversee plans it described as in the nature of insurance. It did not find that the proposals would violate professional standards or responsibilities owed to the public.
Under, section 495 the Appellate Division is concerned with the performance of professional responsibilities by the Bar. *203 Where there is involved the interposition of an organization or corporation in the rendering of legal services, the Appellate Division must assure that the link of professional responsibility (between lawyers and the clients they serve is not diluted, dissolved, or immunized from judicial oversight (see, generally, Matter of Community Action for Legal Servs., 26 A D 2d 354). That concern embraces a great power, but also a limited one. It does not include a concern with the regulation of activity in “ the nature of insurance ”, whatever that m!ay be, or with the social or economic desirability of proposals to provide legal services in one manner or another. This is true so long as professional standards and the public protection served by those standards are not breached. The distinctions are not always clear or brightly demarked, but they are real ones nevertheless. If regulation or supervision beyond the limited powers of the Appellate Division are required, its provision lies with the Legislature.
Despite the Appellate Division’s proper concern with the possible proliferation of prepaid legal services plans without adequate assessment of their fiscal implications by an agency capable of making that assessment, it lacked the power to withhold approval on that ground. Nor are prepaid legal services plans properly encompassed by the statutes regulating insurance. At least this is true, if one were to consider the essential purpose and scope of those statutes, although to be sure, there are elements of contingency and reimbursement in any such plan which bear a similarity to certain kinds of insurance or indemnity. On this view, the two plans were improperly excluded from approval, and the applications should be remitted to the Appellate Division for reconsideration.
The first of the two plans was proposed by a union of municipal employees in the City of New York to operate through a welfare fund trust. The plan would provide specified classes of legal service at moderate cost to its members whose salaries range between $4,000 and $15,000. There would be a modest initial charge, the rendition of services by a legal office of lawyers and related personnel supervised by a law firm representing the union, and subsequent reimbursement by the member clients for legal services in excess of those available under the plan. The union’s members would have the right to retain their own *204 lawyers but without reimbursement under the plan. The plan would operate experimentally for a three-year period.
The second plan was promoted by the New York County Lawyers Association and involved a ¡separate corporation to provide reimbursement for legal services at modest cost to middle-income people who subscribed to the plan for an initial subscription fee of $100 per year. The services would be rendered by participating lawyers who would agree to render services to subscribers within limited scheduled fees for rather narrow classes of legal services to be provided. The subscriber clients would be free to choose their lawyers from among the panel of participating lawyers. To this extent the plan would be an “open panel” system as contrasted with the “closed panel ” of lawyers provided by the union plan described earlier. The Bar Association plan was projected as a pilot plan to operate for one year only to test its feasibility and desirability.
¡Turning to the principal reason for the rejection by the Appellate Division of the applications for approval of the plans, namely, the inadequacy of statutory authority, personnel, and resources to assess and supervise the plans, it is inappropriate.
Under section 495 of the Judiciary Law, the statute restricts the practice of law by corporations and voluntary associations. The purpose is an obvious one, namely, to prevent the commercialization of the profession, and to retain judicial supervision over the professional and public obligations of lawyers. Subdivision 5 of the statute just as clearly has the purpose, among others, of permitting properly approved organizations which have benevolent or charitable purposes to be involved in the operation of law offices. In Matter of Thom (Lambda Legal Defense & Educ. Fund) (33 N Y 2d 608), this court held that “ benevolent ” purpose was not restricted to assistance to the indigent, assuming that, even at that time, the clarification was necessary. The duty of the Appellate Division in passing on applications of nonprofit organizations with benevolent purposes, as noted in the Thom case (supra), is to consider the responsibility of the sponsors, the method of financing, the scope of activities proposed, and other factors which may affect the public interest. But surely that responsibility is not an actuarial one or one akin to that performed by the Insurance Department with respect to licensed insurers. Instead the Appellate *205 Division’s responsibility is to assess the authenticity of the plan, to assure its freedom from any taint of improper professional conduct, to preserve the attorney-client relation, to require full disclosure to prevent fraud or other wrong upon the public, and, above all, to make sure that future professional conduct on behalf of the applicant organizations remains, subject to disciplinary control by the Appellate Division (Matter of Community Action for Legal Servs., 26 A D 2d 354, 359-362, supra).
The Appellate Division’s concern is not ¡with fiscal forecasts or actuarial soundness so long as it can determine, within reason, that the plan appears to be a responsible one and not tantamount to a fraud. Nor is the court concerned with the lively controversy between open ” and “ closed ” panels, provided there is no disguised form of solicitation or barratry involved or unreasonable interposition between lawyer and client (see Justice Department and Other Views on Prepaid Legal Services Plans Get an Airing Before the Tunney Subcommittee, 60 A.B.A. J. 791, 793-796). In the last respect, it should be kept in mind that all existing liability insurance is a form of litigation insurance and the attenuation of the relationship between attorney and client is to a degree accepted as reasonable within supervised and supervisiable professional bounds. So in this area, as in all other areas of human affairs, there are no easy absolutes to apply.
On this analysis, both plans, the union closed-panel plan and the Bar Association’s open-panel plan, could not be denied review by the Appellate Division at the threshold. And, of course, on this analysis it has not been necessary to reach the formidable constitutional questions involved in restricting prepaid legal services plans presented by the rationales of cases such as United Transp. Union v. Michigan Bar (401 U. S. 576) ; Mine Workers v. Illinois Bar Assn. (389 U. S. 217); Railroad Trainmen v. Virginia Bar (377 U. S. 1) ; and NAACP v. Button (371 U. S. 415). Whatever the reach of the holdings in those cases, they should not be read to diminish the State’s power to license, supervise and regulate the Bar in the public interest. That scope of supervision is untrammeled to the extent that its purpose is to qualify the Bar to perform its function for the public benefit and maintain publicly-beneficial profes *206 sionalstandards and conduct (see Railroad Trainmen v. Virginia Bar, supra, at pp. 6-7).
Nor, on this analysis has it been necessary to reach or consider the effect on the union plan of the enactment of the Federal Retirement Income Security Act of 1974 (U. S. Code, tit. 29, § 1002, subd. [1], par. [A]; § 1144, sulbds. [a], [b], par. [2], cl. [B]). It is interesting that this new Federal statute, which did not become effective until January 1, 1975, long after the union application had been submitted to the Appellate Division, was never briefed or even called to the attention of that court. •As a caveat, on an issue not before this court, it is noted that the new Federal statute may, perhaps, pre-empt the regulation of union prepaid legal services plans, qua plans, but does not reach the professional licensure and regulation of lawyers, qua lawyers, who would render legal services under the plans. In the present union appeal, the application relates to the use of lawyers under the proposed union plan setting up a voluntary organization for that purpose.
Proposals for prepaid legal services plans, especially for those of middle income and low income above the level of indigency, have been a matter of widespread interest. The literature is extensive indeed and largely unanimous that new paths must be ,staked out to make legal services available to persons between those served by poverty-level schemes and those rich enough to purchase legal services without assistance or extraordinary measures (see, e.g., Report of N. Y. State Atty.Gen. On the Non-Availability of Leglal Services To Persons of Moderate Income [1972]; Cole, Statute: An Act to Regulate Group Legal Services Plans, 11 Harv. J. Leg. 68; Stolz, Insurance for Legal Services: A Preliminary Study of Feasibility, 35 Chi. L. Rev. 417; Note, Group Legal Services and the Organibed Bar, 10 Col. J. L. & Soc. Prob. 228). The literature on the subject has of course influenced the very plans before the court at this time. The Biar Association plan reflects in many ways, for example, the difficulties in constructing a broad enough plan which would yet be economically feasible, as discussed in an exhaustive treatment in 1968 (Stolz, Insurance for Legal Services: A Preliminary Study of Feasibility, 35 Chi. L. Rev. 417).
And, of course, the Appellate Division expressed the view that the plans submitted may run afoul of the Insurance Law *207 as being in the nature of insurance. In the first place, in a doubtful case it would not necessarily be the province of the Appellate Division but that of the Department of Insurance to seek compliance with its governing law (see Insurance Law, § 35, which provides that the Superintendent of Insurance may maintain and prosecute an action against any person subject to the Insurance Law for the purpose of obtaining an injunction restraining sutah person from doing any acts in violation of the Insurance Law; if the court finds that a defendant is threatening or is likely to do any acts in violation of the law, and that such acts will cause irreparable injury to the public interests, it may grant an injunction). In a clear case of illegality, of course, approval must be denied (see Matter of Small v. Moss, 279 N. Y. 288, 291-292). But even assuming that the Insurance Law might determine the validity of the plans, not more than a cursory analysis is merited.
As a preface to that cursory analysis it must be pointed out that while there has been some briefing by the parties on the issue whether the plans are insurance schemes, the attack peculiarly has been addressed only to the Bar Association plan and not to the union plan. Moreover, the attack has not been developed in depth. Since, it is concluded, that on their face, neither plan .involves insurance, the plans should not be rejected out of hand. On any view of the matter if it should now or later appear to the Department of Insurance that either or both plans are prohibited by the Insurance Law, that department,should be and is free to pursue the remedies available to it.
The Insurance Law is designed to prohibit the business of insurance and related activities, except as licensed and regulated by the Department of Insurance or exempted from such licensure and regulation (see Insurance Law, § 40, subd. 1). The threshold issue arises from the definition of insurance. Section 41 provides that an insurance contract “ include [s] any 'agreement or other transaction whereby one party, herein called the insurer, is obligated to confer benefit of pecuniary value upon another party, herein called the insured or the beneficiary, dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event. A fortuitous *208 event is any occurrence or failure to occur .which is, or is assumed by the parties to be,, to a substantial extent beyond the control of either party. ’ ’
A reading of the statute for its sense arid purpose does not suggest that the instant plans, for prepaid legal Services are insurance schemes. A literal reading of the statute, disregarding its sense and purpose, would of course take in some of the prepaid or reimbursable fees for legal services, to the extent that the -legal services would not be required until a “fortuitous event” had occurred. As for many of the.legal services involved, however, there is, no fortuitousness, in any ordinary sense of the word, in the event which precipitates the\ retention of. a lawyér, such as the drafting of a will, a, separation agreement, the purchase of a house, and many others of the same kind.
Terms like fortuitousness of event in the law, as with the word accident, have always-caused conceptual difficulties (see, e.g., McGroarty v. Great Amer. Ins. Co., .36 N Y 2d 358). The statute, in circumscribing the term to mean, that which is to a substantial bxterit beyond the control of either party, is useful in relating regulation to insurance schemes, as they have been known (see Insurance Law, § 46), but it is not exact in the consideration of agreements to provide services of. various kinds. In this area it is easy to slip into metaphysical, even validly metaphysical, distinctions.
But, metaphysics is not" the . concern of section- 41 of. the Insurance Law; instead the licensure and regulation of insurance "activity is. The proposed prepaid legal services plans' are not insurance businesses or insurance contracts, although it may be that, in the Appellate Division’s judgment and in the future possibly that of the Legislature, they merit the . same degree of regulation and supervision from their fiscal aspects and perhaps even from other aspects.
Viewed as a provider of professional services, sought as a matter of choice, at fiat fees rather than as reimbursement, for material - losses or expenses precipitated by. fortuitous events, the proposed plans do not pose the dangers that the Insurance Law was designed to obviate.. Those dangers embrace inadequate coverage of determinable actuarial risks, excessive premiums on an actuarial basis, and fiscal irresponsibility (see *209 Employers’ Liab. Assur. Corp. v. Aresty, 11 A D 2d 331, 335 [Stevens, J.], affd. on opn. at App. Div. 11 N Y 2d 696).
'That hospital, medical and dental indemnity contracts have been covered in detailed and close regulation in the Insurance Law is not contradictory of what has been said thus far. As the Bar Association argues: “ All that the enactment of [article IX-iC of the Insurance Law] demonstrates is that the legislature believed that such contracts * * * should be regulated by a statute especially tailored to those services and deemed the Insurance Department the most appropriate agency in which to vest the supervision of such corporations.” That the same may become true of organizations providing for prepaid legal services is evidenced by legislation proposed last year, and now pending this year in the Legislature (see 1974 Senate Intro. No. 4887; 1974 Assembly Intro. No. 8916; 1975 Senate Intro. No. 1001; 1975 Assembly Intro. No. 941).
Both plans are concededly experimental. The union plan, as noted, projects an initial three-year period. The Bar Association plan, described as a “ pilot” plan, looks to a one-year experiment to test its worth. These obviously are not ventures into the “insurance” business, nor for the moment do they suggest insurmountable difficulties of assessment by the Appellate Division. Most important, plans like these presented and to be operated by benevolent or charitable organizations, the only kind that the Appellate Division has power to approve, provide a natural limitation on those who might present such plans in order to mask an out-and-out insurance or indemnity scheme. This is further evidence that plans like these fall outside the spirit and purpose of the existing provisions of the Insurance Law.
Yet, the discussion should not be closed without agreeing with the Appellate Division that early legislative attention is indicated. There are now hundreds of such plans already in operation in California alone, and many in other States. The likelihood of significant numbers of such plans being promulgated in this State is quite great. Indeed, the enactment of the Federal Retirement Security Act of 1974 may engender a mass of union welfare plans. The kind of broader regulation, especially fiscal regulation, considered necessary by the Appellate Division, may well be appropriate, and may even *210 become urgently needed as prepaid legal services plans become common.
Accordingly, the orders of the Appellate Division should be reversed, without costs, and the matters remitted to that court for reconsideration in the light of this opinion.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Hooke concur.
In each case: Order reversed, without costs, and matter remitted to the Appellate Division, First Department, for further proceedings in accordance with the opinion herein.