*806 OPINION OF THE COURT
Charles Edward Ramos, J.
In a declaratory judgment action to determine whether services provided by a heating fuel oil company amount to insurance coverage, the Superintendent of the Insurance Department of New York State, Gregory V Serio, moves for a preliminary injunction pursuant to Insurance Law § 327, barring plaintiff Petroleum Heating and Oil Services, Inc. (Petra) from marketing and issuing contracts under its CARE Program without an insurance license, pending resolution of this action. The Superintendent additionally moves for an order directing Petro to carry out any remaining obligations under existing CARE Program contracts under the supervision of the New York State Insurance Department.
Background
The Superintendent heads New York State’s Insurance Department, the governmental agency responsible for regulating the insurance industry. The Department closely supervises the regulatory structure that governs insurance entities, by, inter alla, issuing licenses to insurers, and otherwise ensuring compliance with Insurance Law, which prohibits the sale of insurance unless the seller is licensed as an insurer.
Petro sells heating fuel oil in seven states along the east coast, including New York, and offers customers of its automatic heating fuel oil delivery plan to subscribe, for an additional fee, to a program entitled “Clean Up for Accidental Release to the Environment” (CARE Program or Program). Under the CARE Program, subscribers are provided with inspection, maintenance and repair of heating fuel oil systems, in an effort to minimize the risk of fuel oil spills, and are additionally provided with cleanup services of up to $100,000 in the event that there is a heating fuel oil spill onto a subscriber’s property.
Subsequent to its review of the CARE Program, the Department notified Petro that the Program amounted to an insurance contract, and therefore, Petro was in violation of Insurance Law for providing insurance coverage without a license. Petro thereafter instituted this action, seeking a declaratory judgment that it is not required to obtain an insurance license for offering the CARE Program because it does not constitute insurance coverage.
Discussion
A party seeking preliminary injunctive relief pursuant to CPLR 6301 must show (1) a likelihood of success on the merits, *807 (2) irreparable injury if provisional relief is not granted, and (3) that the equities are in her favor. (J. A. Preston Corp. v Fabrication Enters., 68 NY2d 397, 406 [1986].) This standard has been applied to a motion for a preliminary injunction made pursuant to Insurance Law § 327 (a), which authorizes the Superintendent to bring an action “in the name of the people of the state,” for an injunction restraining individuals from violating Insurance Law, and without requiring the posting of a bond. (People v British & Am. Cas. Co., 133 Misc 2d 352, 360 [Sup Ct, NY County 1986].)
A. Likelihood of Success on the Merits
The Superintendent argues that the Department is likely to succeed on the merits because plaintiff is in violation of Insurance Law, as the CARE Program meets every element of the definition of insurance coverage under Insurance Law § 1101 (a) (1), and neither does it qualify for any of the statutory exemptions.
Insurance Law § 1101 (a) (1) states:
“ ‘Insurance contract’ means any agreement or other transaction where one party, the ‘insurer’, is obligated to confer benefit of pecuniary value upon another party, the ‘insured’ or ‘beneficiary’, dependant upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.” (Emphasis added.)
The Department claims that the CARE Program meets this definition of an insurance contract because it obligates Petro to “confer [a] benefit of pecuniary value upon another party [the subscribing customer],” by absorbing up to $100,000 in cleanup costs, and, furthermore, Petro’s duties under the Program are dependent on the happening of a fortuitous event, an accidental heating fuel oil spill on a subscribing customer’s property.
In contrast, Petro argues that the CARE Program is not an insurance contract subject to regulation by the Department on the grounds that the CARE Program constitutes a service contract or a warranty within the meaning of Insurance Law § 1101 (b) (3-a), and is therefore exempted from regulation.
1. Service Contract Exemption
The parties sharply dispute whether the Insurance Law article 79 definition of “service contract” should be imported to Insurance Law § 1101 (b) (3-a), which enumerates several statutory exemptions *808 from insurance regulation, including service contracts related to the sale of heating fuel oil.
According to Petro, the Legislature intended that warranties, service contracts and maintenance agreements related to the sale of heating fuel oil be exempted from insurance regulation entirely, under Insurance Law § 1101 (b) (3-a). Further, Petro maintains that the Legislature additionally intended that service contracts related to the sale of heating fuel oil be removed entirely from the ambit of article 79, which otherwise regulates service contracts. Accordingly, Petro urges the court to adopt a broader definition of the term “service contract” than that provided under the article 79 definition of “service contract” (Insurance Law § 7902 [k]), to determine if the Program otherwise meets the statutory exemption for service contracts related to the sale of heating fuel oil under Insurance Law § 1101 (b) (3-a).
To establish that this interpretation is to govern the analysis of whether the CARE Program is an exempt service contract, Petro relies on legislative intent purportedly established by several letters included in the Bill Jacket in support of the bill to amend those sections of the Insurance Law relating to the definition of “doing an insurance business.”
In contrast, while concurring that the objectives behind the 1998 and 2000 amendments to the Insurance Law were to exempt, inter alla, service contracts associated with the sale of heating fuel oil from insurance regulation under Insurance Law article 11, and in addition, to heating fuel oil-related service contracts from regulation under article 79, the Department argues that these exemptions would apply as long as the agreement at issue otherwise meets the definition of “service contract” under article 79. Accordingly, the Department urges the court to import the article 79 definition of “service contract” to govern the meaning of “service contract” in Insurance Law § 1101 (b) (3-a). Therefore, the Department maintains that, because the CARE Program does not constitute a “service contract” under article 79, these amendments have no effect on the Program, and thus Petro is not entitled to the statutory exemption of service contracts under Insurance Law § 1101 (b) (3-a).
Insurance Law § 1101 (b) (3-a) states: “[A] service contract pursuant to article seventy-nine of this chapter or warranty, service contract or maintenance agreement conditioned upon or otherwise associated with the sale or supply of heating fuel shall not constitute doing an insurance business in this state.” (Emphasis added.)
*809 Insurance Law § 7901 (b) (4) states that “this article [article 79] shall not apply to . . . [warranties, service contracts and maintenance agreements that are conditioned upon or otherwise associated with the sale or supply of heating fuel.”[1] Finally, Insurance Law § 7902 (k) states that “as used in this article [article 79]” a “service contract” means
“a contract or agreement, for a separate or additional consideration, for a specific duration to perform the repair, replacement or maintenance of property, or indemnification for repair, replacement or maintenance, due to a defect in materials or workmanship or wear and tear, with or without an additional provision for indemnity payments for incidental damages, provided any such indemnity payment per incident shall not exceed the purchase price of the property serviced.”
In undertaking statutory interpretation, the Court of Appeals has held that “when the language of a statute is clear and unambiguous, the statute should be construed so as to give effect to the plain meaning of the words.” (Matter of Grand Jury Subpoena Duces Tecum Served on Museum of Modern Art, 93 NY2d 729, 743 [1999].) Furthermore, the Court should interpret a statute in order to “effectuate the intent of the Legislature.” (Id. at 744.) However, courts may be required to undertake statutory construction of a statute where there exists “doubt, obscurity, or ambiguity” as to the statute’s correct interpretation. (2525 E. Ave. v Town of Brighton, 33 Misc 2d 1029, 1032 [Sup Ct, Monroe County 1962], affd 17 AD2d 908 [4th Dept 1962].) Therefore, when courts must resort to statutory construction, extrinsic sources related to the “probable aim and purpose of the provision” may be used to aid in the statute’s interpretation. (2525 E. Ave., 33 Misc 2d at 1032; see also Reed v James W. Bell & Co., 188 Misc 914, 916 [1st Dept 1947].)
In attempting to give effect to the plain meaning of the words of the statute (2525 E. Ave., 33 Misc 2d at 1032), the court must determine whether the article 79 definition of “service contract” should properly be applied to the statutory exemption provi *810 sion’s reference to “service contracts . . . that are conditioned upon or otherwise associated with the sale or supply of heating fuel,” under Insurance Law § 1101 (b) (3-a). Article 79 is the only article in the Insurance Law which provides a definition for “service contract,” otherwise stating that the definition of “service contract” provided under Insurance Law § 7902 (k) is to govern all references made to “service contracts” throughout the article. While Insurance Law § 7901 (b) (4) provides that service contracts related to the sale of heating fuel oil are otherwise removed from the ambit of regulation of service contracts under article 79, in order to qualify as a service contract eligible for this exemption, the agreement at issue must therefore first meet the definition of “service contract” under Insurance Law § 7902 (k).
Alternatively, Insurance Law § 1101 (b) (3-a) consists of two clauses which contain a reference to a “service contract,” and the clauses are separated by the word “or.” Taking the two clauses together, the statute can be interpreted to read that a service contract can be exempt from insurance regulation on two alternative grounds: under the first clause, as a “service contract” pursuant to article 79, or, under the second clause, as a service contract that is related to the sale or supply of heating fuel oil.
The article 79 definition of “service contract” clearly applies to the first clause, as the clause expressly states that the article shall apply (“a service contract pursuant to article seventy-nine of this chapter”). (Insurance Law § 1101 [b] [3-a].) As to the reference to “service contract” located in the second clause, although article 79 is not mentioned as in the previous clause, under prevailing principles of statutory interpretation, the terms should be treated uniformly throughout the statute and carry the same meaning, because where the same term is used in different parts of a statute, it is presumed to carry the same meaning throughout, unless otherwise indicated. (Mangam v City of Brooklyn, 98 NY 585, 592 [1885]; McKinney’s Cons Laws of NY, Book 1, Statutes § 236.)
Under this principle, it then follows that a “service contract” under article 79 carries the same meaning as a “service contract” under Insurance Law § 1101 (b) (3-a). Rephrased slightly, an agreement therefore qualifies as an exempt service contract under Insurance Law § 1101 (b) (3-a) only if it first qualifies as a “service contract” under the article 79 definition.
Petro argues that such interpretation is illogical, maintaining, rather, that if the Legislature intended the article 79 definition *811 of “service contract” to be imported to Insurance Law § 1101 (b) (3-a), presumably the Legislature would not have included the disjunctive “or” to separate the two clauses, which otherwise suggests that there is a choice to be made between the two provisions.[2] The court is inclined to reject this argument primarily because the statute otherwise fails to indicate that a service contract under Insurance Law § 1101 (b) (3-a) is to be regarded any differently than a service contract under article 79, and under the principle cited above, in the absence of statutory language indicating that a contrary treatment should govern, the same terms are presumed to carry the same meanings throughout a statute. {Mangam, 98 NY at 592.) Therefore, the court is more favorably disposed to interpret Insurance Law § 1101 (b) (3-a) as meaning, that in order to qualify as an exempt service contract associated with the sale of heating fuel oil, the agreement must first qualify as a service contract under article 79.
Despite the analysis above, ambiguity as to the correct interpretation of Insurance Law § 1101 (b) (3-a) and article 79 taken together persists, given the placement of the disjunctive “or” placed between the two clauses referencing “service contract” in Insurance Law § 1101 (b) (3-a), suggesting two alternatives. Therefore, in order to ensure that the interpretation undertaken by the court accurately reflects the intent of the Legislature, related extrinsic sources will be considered. (Reed, 188 Misc at 916.) Courts are permitted to consider extrinsic sources such as legislative reports (Schaefer v Ropes, 113 Misc 654, 658 [NY City Mun Ct 1920]), and petitions to the Legislature requesting that some piece of legislation be passed, to aid in statutory interpretation. (Matter of Rathscheck, 300 NY 346, 351 [1950].)
Accordingly, the letters from legislators contained in the Bill Jacket may be considered by the court to aid in its interpretation of the text in order to “effectuate the intent of the Legislature” (93 NY2d at 744). In a letter from sponsoring Assemblyman Farrell to Governor Pataki’s office, he states,
“This bill [2000 Amendment] clarifies the Legislature’s intent to exclude fuel oil company warranties, service contracts and maintenance agreements from operation of the Insurance Law . . . Such contracts *812 may provide for the maintenance of equipment as well as clean up services . . .
“[Tjhis provides an effective means for the fuel oil supplier to promptly detect a fuel oil leak . . . such fuel oil service contracts, thus, provide both an effective means to prevent or contain spillage or leaks as well as increased protection to the citizens of New York . . .
“[I]f such contracts were not made available by fuel oil suppliers, it is unlikely that any cleanup services would or could be performed by the fuel oil purchaser in the event of an oil leakage or spill. . . [I]f the fuel oil purchaser were required to purchase an insurance contract to cover maintenance and cleanup costs, it would significantly add to the cost of owning a fuel oil unit.”[3]
Additionally included in the Bill Jacket is a letter from Senior Assistant Majority Leader Velella, wherein he states:
“[Tjhe Legislature’s intent was not to include maintenance agreements issued by companies that deliver fuel oil or propane because issuance of such agreements was only ancillary to their primary business of delivering oil.
“Thus, by definition, these service contracts were not to be considered as insurance and therefore exempt from the provisions of the law.
“This bill merely clarifies the original legislative intent that warranties, service contracts and maintenance agreements associated with sale or supply of heating fuel are exempt from the service contracts law.”[4]
These letters buttress Petro’s contention that the Legislature’s objective in drafting the 1998 and 2000 amendments to the Insurance Law was to exempt heating fuel oil cleanup agreements from insurance regulation, and exempt related service contracts from service contract regulation. However, the letters do not suggest that, in order to achieve these exemption objectives of the Legislature, heating fuel oil-related agreements purporting to be service contracts would be held to a different standard than other agreements. Rather, the most logical interpretation of these letters is that, to be exempt from regulation, *813 the agreements at issue necessarily have to first qualify as a warranty, maintenance agreement or service contract. This interpretation corresponds to the court’s interpretation of article 11 and article 79, discussed above.
Moreover, these letters do not reflect any sentiment suggesting that the amendments were intended to bar the application of the article 79 definition of a “service contract” to the statutory exemption of service contracts related to the sale of heating fuel oil under Insurance Law § 1101 (b) (3-a), as Petro maintains. While such treatment would undoubtedly qualify more heating fuel oil cleanup agreements for exemption, in the absence of extrinsic sources indicating that such a treatment was intended, it is beyond the province of the court to read such language into the statute under the guise of statutory interpretation. (Bright Homes v Wright, 8 NY2d 157 [I960].) Furthermore, even if it was the Legislature’s intention to entirely remove the article 79 definition of “service contract” from service contracts related to the sale of heating fuel oil under Insurance Law § 1101 (b) (3-a) for the purpose of qualifying more heating fuel oil cleanup agreements for statutory exemptions, and the application of the article 79 definition to the second clause of Insurance Law § 1101 (b) (3-a) is therefore an unintended consequence of the statute’s drafting, the court still may not add to a statute, nor effect any changes in the wording of a statute (Knolls Coop. Section No. 1 v Hennessy, 1 Misc 2d 1001, 1008 [Sup Ct, Bronx County 1955], affd 1 AD2d 945 [1st Dept 1956], affd 2 NY2d 514 [1957]) even if such changes are called for to correct errors, omissions or defects in the statute itself. (McCluskey v Cromwell, 11 NY 593, 601 [1854].) Such corrections are the proper function of the Legislature and not the court. (Knolls Coop. Section No. 1 v Hennessy, 1 Misc 2d 1001 [1955].)
Accordingly, the court concludes as a matter of law that, in order to qualify as a service contract under Insurance Law § 1101 (b) (3-a), the agreement must meet the definition of “service contract” under Insurance Law § 7902 (k).
2. Service Contract Analysis
Insurance Law § 7902 (k) defines a “service contract” as
“a contract or agreement, for a separate or additional consideration, for a specific duration to perform the repair, replacement or maintenance of property, or indemnification for repair, replacement or maintenance, due to materials or workmanship or wear and tear, with or without an additional provi *814 sion for indemnity payments for incidental damages,[5] provided any such indemnity payment per incident shall not exceed the purchase price of the property serviced . . . Service contracts may also include contracts to repair, replace or maintain residential appliances and systems.” (Emphasis added.)
Given the disjunctive “or” placed between the two clauses, the statute defines two alternate agreements that could properly constitute service contracts: (1) an agreement that provides for the repair, replacement, or maintenance of property, or (2) an agreement that provides indemnification for the repair, replacement, or maintenance of property, and if the agreement contains an additional provision for indemnity payments for incidental damages, the payment may not exceed the purchase price of the actual property being serviced. (Insurance Law § 7902 [k].) The statute further provides that, under both types of agreements, the repair, replacement or maintenance of the property, irrespective of whether it provides for indemnification for such costs or not, be “due to” some defect in that property, or wear and tear of that property.
Petro maintains that the CARE Program falls under the first type of agreement under Insurance Law § 7902 (k), and, therefore, is not bound by the purchase price limitation of the second type of agreement in the statute, because Petro does not provide indemnification or indemnity payments under the CARE Program. Rather, Petro maintains that the purchase price limitation on indemnity payments under the last clause of Insurance Law § 7902 (k) does not apply to the CARE Program because, in the event that there is an oil spill, the Program directly obligates Petro to render cleanup services of up to $100,000, rather than obligating Petro to make indemnity payments to the subscriber.
The Department’s main contention is that the CARE Program provides indemnity payments under the second type of agreement listed in the clause, because Petro absorbs the cost of cleanup, either by providing cleanup itself, or by contracting a third party to provide cleanup services. Therefore, the Depart *815 ment argues, because Petro provides up to $100,000 in cleanup costs, this amount far exceeds the purchase price of a customer’s heating fuel oil system.
While Petro does provide repair, replacement and maintenance of a customer’s heating fuel oil system through various incorporated agreements, the more problematic aspect of the CARE Program are those service agreements in which Petro provides for cleanup of heating fuel oil accidentally released on a subscriber’s property, of up to $100,000. Covering the costs of an oil spill subsequent to the repair, replacement and maintenance of the heating fuel oil system amounts to absorbing the cost of incidental damages. Therefore the provision obligating Petro to provide cleanup for incidental damages of an oil spill subjects Petro to the purchase price limitation of the second clause of Insurance Law § 7902 (k).
Further, that the CARE Program obligates Petro to conduct cleanup services itself or to contract to a third party[6] the cleanup effort, in addition to paying for the cleanup costs, does not change that Petro provides indemnification because Petro is still retaining the financial burden of the cleanup costs. Moreover, the statute does not make any distinction between an agreement to provide services and an agreement to pay for the cost of providing services. Thus, it is fair to say that Petro often does not conduct the actual cleanup services itself, further buttressing the conclusion that Petro provides indemnification for incidental damages by covering the costs of cleanup that it either conducts itself, or subcontracts to a third party.
Accordingly, because the CARE Program’s coverage of up to $100,000 far exceeds the costs of most customers’ fuel oil systems, comprised of tanks and pipes,[7] the CARE Program does not constitute a service contract under Insurance Law § 7902 (k), and, therefore, the Program is necessarily not entitled to the statutory exemption for service contracts related to the sale of heating fuel oil under Insurance Law § 1101 (b) (3-a).
Notwithstanding the service contract exemption, Petro argues that the CARE Program is exempt from insurance regulation on the ground that the CARE Program constitutes a warranty within the meaning of Insurance Law § 1101 (b) (3-a).
*816 3. Warranty Contract Exemption
Under Insurance Law § 1101 (a) (1), an insurance contract is any agreement whereby one party, the insurer, confers a benefit of pecuniary value on another, the insured, dependent upon the happening of a fortuitous event. The Department argues that the CARE Program constitutes an insurance contract primarily because it covers cleanup costs for heating fuel oil spills caused by “fortuitous events,” rather than by spills caused by defects in the heating fuel oil system itself. Furthermore, the Department argues, because the services provided under the CARE Program have no relationship to the product Petro actually supplies, the heating fuel, Petro’s services constitute an insurance contract.
Under the first prong of the inquiry developed by courts to determine whether a service and maintenance plan constitutes a warranty contract or an insurance contract subject to regulation, dubbed the “substantial control” test, the court determines whether the provider’s liability for loss under the plan at issue is triggered by the happening of a fortuitous event. (Electronic Realty Assoc. v Lennon, 94 Misc 2d 249, 253 [Sup Ct, Dutchess County 1978], mod on other grounds 67 AD2d 997 [2d Dept 1979], lv denied 47 NY2d 705 [1979].)
Under the “substantial control” test, an event is deemed fortuitous if its occurrence is beyond the substantial control of either party. (New York State Elec. & Gas Corp. v Lexington Ins. Co., 204 AD2d 226, 226 [1st Dept 1994].) Determination of whether coverage is dependant on fortuitous events is generally an issue of law for the court to decide. (A & B Enters. v Hartford Ins. Co., 198 AD2d 389, 390 [2d Dept 1993].) Furthermore, plans providing for the replacement or maintenance of parts not actually manufactured or sold by the coverage provider, often termed “third-party product” warranties, are generally considered insurance contracts and not warranties, because the actual service provider is a third party to the transaction between the seller of the product and the consumer, and therefore the provider’s coverage obligation is seen as unrelated to the quality or efficiency of the product being manufactured or sold, and thus the plan is deemed to be the assumption of losses caused by fortuitous events. (Gerenstein v Weiner, 9 Misc 2d 259, 260 [App Term, 2d Dept 1957] [agreement providing for the servicing of neon signs covering the replacement of parts not manufactured or sold by the servicing company for a monthly fee is an insurance contract because the provider’s li *817 ability was not related, to defects in quality but was the assumption of a fortuitous risk]; NY Ins Dept Gen Counsel Op No. 02-05-11, 2002 NY Insurance GC Opinions LEXIS 44, *1-2.)
“Third-party product” warranties may still be considered warranty contracts for the purposes of insurance regulation exemption, however, as long as there is a sufficient relationship between the service provided by the third-party provider and the quality of the product sold by another, and the service provider’s liability is otherwise not dependant on the happening of fortuitous events. (Electronic Realty Assoc., 94 Misc 2d 249 [1978].)
In Electronic Realty, the court held that a plan providing for the repair or replacement of home equipment for new home buyers was a warranty contract rather than an insurance contract, because, although the plan providers did not actually manufacture or sell the equipment it was servicing, its liability under the plan was not triggered by the happening of fortuitous events because the plan otherwise expressly excluded coverage for unforeseen failures caused by fire, theft and “other types of peril.” (Id. at 253.) Therefore, the Electronic Realty court found that, because the plan provider did have some degree of control over the types of occurrences that would ultimately subject it to liability, such as failure to detect wear and tear during inspections that might give rise to a subsequent breakdown in the equipment, the plan met the “substantial control” test. (Id. at 249.)
Petro argues that its inspections, maintenance and repair of a customer’s heating fuel oil system under the CARE Program prevents and limits oil spills. Further, Petro argues that, although the Program does not exclude every fortuitous event imaginable, the Program only incidentally involves risks arising from fortuitous events.[8] In the event that Petro is unable to prevent a heating fuel oil spill, whether due to a service error, or wear and tear, Petro provides for cleanup under the CARE Program by sending its own technicians or contracting out the work.
Accordingly, Petro has substantial control over the types of events that would otherwise subject it to liability, because the *818 purpose of its routine inspections and maintenance of a customer’s heating fuel oil system and monitoring of the customer’s oil usage after installation, is to detect defects that, if left undetected, would ultimately lead to an oil spill. Additionally, the services provided by Petro have a substantial relation to the heating fuel oil it sells, because it ensures that its product, heating fuel oil, does not spill onto a customer’s property, causing environmental and property damage. Given that the inspection, maintenance and repair services Petro provides under the CARE Program is substantially related to the quality of the heating fuel oil systems itself, Petro has at least partially met the requirements of the “substantial control” test.
Petro additionally maintains that the majority of heating fuel oil spills are not caused by “acts of God,” but rather by wear and tear in heating fuel oil systems. Petro argues that, in the seven years since the CARE Program’s inception, out of roughly 1,750 heating fuel oil spills, including at least 59 such occurrences in New York alone, not one spill was the result of a catastrophic act of nature, or “act of God.” Furthermore, that Petro has since included an express exclusion for “acts of God” to the CARE Program Appendix, discussed above, the court is satisfied that Petro is not subjecting itself to liability for unforeseen risks within the meaning of Electronic Realty, discussed above.
The court rejects the Department’s argument that the CARE Program embraces a level of fortuity not tolerated in Insurance Law in the absence of a regulated insurance contract, including its dissatisfaction with the recently added exclusion for “acts of God,” because, as the Department argues, the Program still does not exclude fortuitous events such as damage accidentally or intentionally caused by a third party or by an animal.
In Matter of Feinstein, the Court of Appeals held that plans for prepaid legal services operated through a welfare trust fund and a local bar association for the benefit of union members did not constitute insurance, in part, because the rendition of legal services was not generally triggered by fortuitous events, although some degree of fortuity is indeed involved in the need for legal services. (Matter of Feinstein [Attorney General of State of N.Y.], 36 NY2d 199, 208 [1975].) As the Feinstein court noted, “[t]erms like fortuitousness ... in the law, as with the word accident, have always caused conceptual difficulties . . . [i]n this area it is easy to slip into metaphysical. . . distinctions.” (Matter of Feinstein, 36 NY2d at 208.) While Feinstein’s holding was subsequently narrowed to apply primarily to the rendition of *819 prepaid legal services (see State of New York v Blue Crest Plans, 72 AD2d 713, 714 [1st Dept 1979]), its comment on the difficulty in adhering to a rigid definition of fortuity buttresses Petro’s argument that a relatively minimal degree of fortuity in a service plan will otherwise not render a warranty contract an insurance contract.[9] The Electronic Realty court, for example, found the plan at issue was a warranty contract because the service provider does, “to some extent, have control over the events that would subject it to liability.” (Electronic Realty Assoc., 94 Misc 2d at 254.)
Therefore, as the court has found that the CARE Program meets the “substantial control” test, in that Petro has substantial control over the happening of events that would trigger its liability, the CARE Program is a warranty contract, and under Insurance Law § 1101 (b) (3-a) will not be considered to be “doing an insurance business,” as it is a “warranty . . . conditioned upon or otherwise associated with the sale or supply of heating fuel.” That the exclusions contained in the CARE Program, for, inter alla, “acts of God,” in addition to damages caused by war or revolution, and by the customer’s negligence or recklessness, do not cover every conceivable act which could result in damage does not otherwise render Petro’s liability dependent on the happening of fortuitous events, because the Program’s minimal embrace of fortuity is reasonable. Accordingly, the CARE Program is exempt from insurance regulation under Insurance Law § 1101 (b) (3-a) as a warranty contract that is associated with the sale of heating fuel oil.
B. Irreparable Harm
Under Insurance Law § 327 (b), to satisfy the “irreparable harm” prong of the preliminary injunction analysis, the court must find that the violation of Insurance Law “will cause irrep *820 arable injury to the interests of the people of this state.” As the court has already determined that the CARE Program constitutes a warranty associated with the sale of heating fuel oil that is exempt from insurance regulation under Insurance Law § 1101 (b) (3-a), Petro is not in violation of Insurance Law. Therefore, there exists no legally recognized injury the Department can claim is in danger of irreparable harm absent an injunction.
The Superintendent further argues that there is a danger that Petro may become insolvent. These allegations are based on an October 2004 press release concerning Petro’s parent, Star Gas Partners L.P Petro opposes any allegations suggesting that its parent is on the verge of insolvency, and submits the affidavit of Ami Trauber, the parent Star Gas Partners L.P’s CFO, who attests to the parent’s sound financial condition.
The licensing requirement under article 11 of the Insurance Law is to ensure that insurers meet minimum capital and surplus requirements, for the purpose of protecting the insured from an insolvent insurer who may be financially unfit to cover its liability. However, mere speculation that Petro may be unable to provide services under the CARE Program due to the potential insolvency of its parent is insufficient to satisfy the irreparable harm element. (Kaufman v International Bus. Machs. Corp., 97 AD2d 925, 926 [3d Dept 1983], affd 61 NY2d 930 [1984] [movant cannot merely rely on bare conclusory allegations to satisfy elements of preliminary injunction].) Accordingly, the Department has failed to establish that the public will be irreparably harmed absent an injunction.
C. Balance of the Equities
The Department must show that the burden caused to Petro through imposition of an injunction is less than the harm caused to the public by Petro’s activities under the CARE Program. (Edgeworth Food Corp. v Stephenson, 53 AD2d 588 [1st Dept 1976].) While the court has not found a danger of irreparable harm to the public because Petro is not in violation of Insurance Law, the equities also do not favor granting an injunction.
As discussed above, the Legislature’s objective in passing the 1998 and 2000 amendments to the Insurance Law was to exempt, inter alla, warranty contracts offered in connection with the sale of heating fuel oil because they “provide New York residents with a cost effective means to maintain their heating *821 oil units in good condition while protecting the environment.”[10] Given the benefits identified by the Legislature as a basis for drafting a statutory exemption to these agreements, the court finds that the equities tip in favor of allowing the continued availability to the subscribing public agreements such as the CARE Program. Therefore, the court declines to enjoin Petro from issuing contracts under the CARE Program.
Finally, the court is mindful that, in finding that Petro is not in violation of Insurance Law as a basis for denying the motion for preliminary judgment, Petro is entitled to a declaratory judgment to that effect. Although the Department moved for a preliminary injunction, as the relief ultimately sought by the Department is a dismissal of the complaint on the ground that Petro is not entitled to declaratory relief because Petro is in violation of Insurance Law, it is therefore proper under the circumstances to declare the parties’ rights. (St. Lawrence Univ. v Trustees of Theol. School of St. Lawrence Univ., 20 NY2d 317, 325 [1967] [in denying defendant’s motion to dismiss the complaint, thereby preserving jurisdiction over the controversy, the court found that the defendant was entitled to declaratory judgment even though it moved only to dismiss the complaint]; see also Rivera v Russi, 243 AD2d 161, 166 [1st Dept 1998] [in action for declaratory and injunctive relief as to whether the sheriff has the exclusive responsibility to execute civil warrants pursuant to a provision of Mental Hygiene Law, the court, in interpreting the provision at issue as a matter of law, held that, although defendants moved solely to dismiss the complaint and did not themselves seek declaratory relief, it was proper under the circumstances to deny the motion to dismiss and declare the rights of the parties]; Clements v Schultz, 200 AD2d 11, 13-14 [4th Dept 1994] [in an action for declaratory judgment regarding plaintiffs rights to a roadway on defendant’s property, the appellate court held that in granting partial summary judgment in plaintiffs favor on the ground that his deed created an enforceable easement on defendant’s land, the trial court should also have declared the rights of the parties in the action].)
While the cases cited for this principle deal primarily with motions to dismiss the complaint and motions for summary judgment in underlying declaratory judgment actions, the court finds that the parties have, in effect, by their arguments presented on the merits in support of their respective positions on *822 this motion, requested this court to determine their rights. Thus by its determination that plaintiff is not in violation of Insurance Law in its analysis of the Department’s likelihood of success on the merits, the court is, by implication, ruling as a matter of law on the sole issue in this action, and as there remain no triable issues, declaratory judgment is appropriate (Mandis v Gorski, 24 AD2d 181, 185 [4th Dept 1965]), and the court will proceed to declare the parties’ rights. (Gill v Logan, 62 AD2d 1029 [2d Dept 1978]; see also Russell v Marboro Books, 18 Misc 2d 166, 191 [Sup Ct, NY County 1959] [the remedy of declaratory judgment is within the court’s discretion].)
Ordered that defendant’s motion for a preliminary injunction is denied; and it is further ordered that it is adjudged and declared that the CARE Program is not a contract of insurance under the New York Insurance Law.

. Article 79 otherwise subjects service contracts to the regulatory regiment of Insurance Law § 7903, which includes various financial, disclosure and registration requirements. Therefore, while Insurance Law § 1101 (b) (3-a) exempts service contracts, including heating fuel oil-related service contracts,, from insurance regulation, Insurance Law § 7901 (b) (4) further exempted certain types of service contracts from service contract regulation under article 79, including heating fuel oil-related service contracts.

. Typically, the word “or” as used in a statute indicates an alternative exists, “presenting a choice” of either propositions that the word “or” separates. (McKinney’s Cons Laws of NY, Book 1, Statutes § 235.)

. Bill Jacket, L 2000, ch 486, at 4-5 (emphasis added).

. Bill Jacket, L 2000, ch 486, at 3 (emphasis added).

. Under Insurance Law § 7902 (c), incidental damages is defined as “the meaning set forth in subdivision one of section 2-715 of the uniform commercial code.”
UCC 2-715 (1) defines incidental damages as damages “resulting from the seller’s breach.”

. The manager of the CARE Program, Donna McConnell, states in her affidavit that, in the event of a large oil spill, Petro retains and pays subcontractors to conduct the cleanup.

. Neither party disputes that the purchase price of a heating oil system exceeds $100,000.

. Since this action was commenced, Petro has added an “act of God” exclusion to the appendix of every CARE Program that has since been instituted. The exclusion applies to damages “arising from any acts of God or nature, or any natural occurrence beyond your control or influence, such as hurricanes, floods or earthquakes.”

. Petro additionally cites other jurisdictions who have adopted a broader viewing of fortuity.
In Transportation Guar. Co. v Jellins (29 Cal 2d 242, 248, 174 P2d 625, 629 [1946]), while discussing the element of fortuity in the determination of whether the agreement at issue constituted an insurance contract, the court stated that
“nearly every business venture entails some assumption of risk, some element of gambling ... a sound jurisprudence does not suggest the extension, by judicial construction, of the insurance laws to govern every contract involving an assumption of risk or indemnification of loss; . . . when the question arises each contract must be tested by its own terms as they are written, as they are understood by the parties, and as they are applied under the particular circumstances involved.”

. Sponsor’s Mem, Bill Jacket, L 2000, ch 486, at 4.